**Harold OBERMILLER, Plaintiff,**

v.

**Joseph SIEGEL et al., Defendants.**

**Civ. No. 1821 L.**

United States District Court,
D. Nebraska.

April 5, 1972.

Norman Krivosha, Lincoln, Neb., for plaintiff.

James M. Knapp, Kearney, Neb., for defendants.

## MEMORANDUM OF DECISION

URBOM, Chief Judge.

This is an action to challenge the redistricting of the seven supervisor districts in Sherman County, Nebraska. I conclude that the redistricting was lawful and that the challenge must fail.

Under Nebraska statutory provisions the responsibilities of government are partially borne by townships through county supervisors. The supervisors are authorized to maintain certain roads, public wells and cemeteries; raise taxes; protect trees and property; keep offal of the streets; regulate the running at large of horses, mules, asses, swine, sheep and goats; and provide for township scales and a township band.

## STATEMENT OF FACTS

On or about November 24, 1970, the County Board of Supervisors of Sherman County, Nebraska, received from the United States Department of Commerce, Bureau of the Census, the final 1970 census figures and population count of the various townships, cities and villages in Sherman County, Nebraska. Immediately thereafter the County Board of Supervisors scheduled a public hearing on redistricting plans and published notice of the hearing in newspapers of general circulation in Sherman County, informing the public that the hearing would be held at the courthouse in Loup City, Nebraska, at 10:00 a. m. on December 23, 1970. The hearing was held. On about February 5, 1971, the County Board of Supervisors redistricted the supervisor districts of Sherman County into seven new districts, the population of each being as follows:

Supervisor district #1—population 658
Supervisor district #2—population 651
Supervisor district #3—population 663
Supervisor district #4—population 660
Supervisor district #5—population 660
Supervisor district #6—population 663
Supervisor district #7—population 665

Each of the districts, as reconstituted on February 5, 1971, is composed of a regular and compact form and shape and has, as nearly as possible, the same number of inhabitants as any other district.

The plaintiff attacks the redistricting constitutionally and statutorily. The constitutional argument is that the rearrangement of the district amounts to invidious discrimination under the equal protection clause of the Fourteenth amendment of the United States Constitution.

CONSTITUTIONAL ARGUMENT

The plaintiff does not claim with conviction that the redistricting does not meet the one man-one vote principle of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), and Hadley v. Junior College District of Metropolitan Kansas City, Missouri, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970), if sheer arithmetical evenness is the only element. He does urge that the population of the city of Loup City comprises approximately one-fourth of the inhabitants of the county, but that the districts are so arranged that the number of supervisors which the inhabitants of the city elect is less than one-fourth of the number of supervisors elected by the entire county population. The argument is expressed by plaintiff's counsel in his brief as follows:

"Under the scheme adopted by the Sherman County Board of Supervisors, approximately half of the city of Loup City is represented by one supervisor; the remainder of the city's populous [sic] is divided in half, one-fourth of the city going to one district and one-fourth to another district. Thus instead of being assured of at least two of the seven supervisors, the inhabitants of Loup City are guaranteed only one supervisor. The vote of an inhabitant of either of the other two parts of the city that are joined with the outlying rural areas is therefore diluted in that his representation will be determined by the voters in the outlying rural areas. Thus under the scheme adopted, the city dwellers are in each instance in a definite minority. This is constitutionally not permissible as pointed out in the *Hadley* case. This built-in bias against the inhabitants of Loup City, in effect assuring the election of a supervisor from the rural area, is definitely arbitrary and invidious discrimination."

■ This constitutional argument must fail. The *Hadley* case in no way supports the plaintiff's argument. In *Hadley* there was a built-in discrimination against voters in large districts, because large districts (having the larger population) were given a smaller percentage of the number of officials to be elected than the percentage their population bore to the total population voting for officials. Not so in the present case. Here the issue is whether the one man-one vote concept must be infused with an additional element—likeness of interest among the people of each geographical election district. I think the answer is in the negative. Population, not interests or supposed interests, is the touchstone of Reynolds v. Sims and its progeny. Nothing in the decisions of the Supreme Court of the United States suggests that one man-one vote means that there must be a subdividing of persons into categories measured by their rural-town residences.

■ The situation in the present case is much weaker from the plaintiff's standpoint than was the plaintiff's position in Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), in which it was claimed that there was racial gerrymandering. The district court concluded that the plaintiffs had failed to establish any violation of their constitutional rights and the Supreme Court accepted the district court's finding that the plaintiffs had failed to prove the legislature "was either motivated by racial considerations or in fact drew the district on racial lines." In the present case there has been a complete failure of proof that the district lines were drawn with a view to reducing the effectiveness of the votes of the city dwellers, even if doing so could amount to invidious discrimination.

The following probably is accurate in analysis:

"In the reapportionment cases, the Court has been concerned only with the question of the individual's right to vote, not with the right of interests or groups to representation. Implicitly recognizing that the right to vote and the right to representation present fundamentally different constitutional problems, the Court has treated the voting question in isolation, asserting the constitutional right of each citizen to an 'equally weighted' vote without reference to the question of which citizens or interests should succeed in electing legislative representatives. As one commentator observed:

For the Supreme Court to have made any attempt whatever to insure the accommodation of any interest—geographical, economic, ethnic, partisan, or 'historical'—in the legislative process would have catapulted it headlong into the continuing political questions, not simply of whether, but also of *which* groups are to receive political advantages in the legislative process. Such questions are at the heart of public policy determination." [W. P. Irwin, "Representation and Election: The Reapportionment Cases in Retrospect," Michigan Law Review, vol. 67 (1969), pp. 729, 748]

Terry B. O'Rourke, "Reapportionment Law, Politics, Computers," American Enterprise Institute for Public Policy Research (1972), p. 47.

### STATUTORY ARGUMENT

The plaintiff's statutory argument is bottomed upon the proviso in § 23–204, R.R.S.Neb.1943, which states:

"*Provided,* in counties having cities of over one thousand inhabitants and where such cities have more inhabitants than the average outlying district, the county board shall add enough contiguous territory to such city so that the inhabitants in such city and contiguous territory shall equal the inhabitants of two of the other districts. The county judge, county clerk and county treasurer shall then divide the tract thus segregated into two supervisor districts with population as nearly equal as possible, and when so divided, each of said districts shall elect one supervisor who shall reside in such supervisor district and be nominated and elected by the qualified electors residing in that district. If any such city has more than the requisite inhabitants for two supervisor districts, then sufficient outlying territory may be added to such city to make three supervisor districts. The supervisor in each supervisor district in such city shall reside in such supervisor district, and be nominated and elected by the qualified electors residing in that supervisor district. The remainder of the county outside of such city districts shall be divided so as to create a total of seven supervisor districts."

The plaintiff argues that the city of Loup City had more than the requisite inhabitants for two supervisor districts; that the county board should have formed the city into three city districts; and that the county board divided the city of Loup City into only one "city" district and two "city-farm" districts, thereby violating the intent of the legislature.

■ Although the defendants take the position that the entire § 23–204 relates only to the *original* composition of supervisor districts and not to rearrangement of districts, I think the case of State ex rel. Rowe v. Emanuel, 142 Neb. 583, 7 N.W.2d 156 (1942), directs a contrary result. The requirements of the proviso must be met, even though the redistricting properly is done by the county board, rather than the county judge, county clerk and county treasurer.

The requirements of the proviso have been met in the present case. Sherman County contained 4,620 inhabitants at the time of the 1970 census.

The establishment of seven supervisor districts with an equal number of inhabitants in each would mean an average of 660 in each district. The city of Loup City had 1416 inhabitants. It thus had more than the requisite inhabitants for two supervisor districts, which means that under the statute "sufficient outlying territory may be added to such city to make three supervisor districts." If two supervisor districts had been formed, each containing no person who was not a resident of Loup City and if those two districts had been equal to each outlying district, those two districts would have accounted for 1320 of the residents of Loup City, leaving a balance of 96 persons who were residents of Loup City and who were not in one of those two districts. Under the statute sufficient outlying territory could have been added to the portion of the city containing those 96, thus forming a district composed of 96 residents of Loup City and approximately 564 rural residents. Instead, the county board chose to form one district, # 4, containing 660 residents, all from within the city limits of Loup City [1] ; one district, # 3, comprised of 451 residents of Loup City and 212 nonresidents; and one district, # 2, having 271 residents of Loup City and 380 nonresidents of the city. Whether it would have been wiser to have put a larger number of residents in either district 2 or 3 is not for this court to say. It is clear that a substantial majority of the persons in both districts 4 and 3 reside within the city of Loup City and I doubt that § 23–204 requires more than that. If the statutory words "city districts" require the existence of more than one "city" district and if a district can be a "city" district only if a majority of its inhabitants are also inhabitants of a city, then the requirements of the statute have been met in this instance. It is only if a district, to be a "city" district, must have all its inhabitants from the city that the redistricting in the present case does not meet the statutory requirements. I find nothing in the statute which suggests such a restrictive definition of the words "city districts." Neither do I find any rationale for such a definition, and the plaintiff has offered none.

Another point is suggested by the plaintiff. He says that the redistricting was done in such a manner as to keep in office the supervisors who then were in office. The fact that the redistricting resulted in districts surrounding the place of residence of each of the supervisors is too fragile to support a finding of a violation of the constitution or of the statute. No other evidence was offered by the plaintiff which would tend to assist in a claim that the plan was deficient because of the place of residence of the supervisors.

An indication is made by the plaintiff that the county board should have dissolved itself before the making of any boundary change prompted by a need for redistricting. It is true that § 23–204 is written in terms of action by the county judge, county clerk and county treasurer, but in light of § 23–269, R.R.S.Neb.1943, which specifically declares that it is the duty of the county board to make changes in boundaries arising from changes of population, and in view of State ex rel. Rowe v. Emanuel, supra, I conclude that no obligation rested upon the county board to dissolve itself.

Judgment will be entered for the defendants.

---

1. The specific figures in defendants' Exhibit 1 do not quite support the conclusion that all residents of district #4 are within the city limits. The figures there, when matched with the area outlined in plaintiff's Exhibit 5 and defendants' Exhibit 3, indicate that 614 persons reside in that district within the city limits. Either the figures are incorrect, or there are not 660 inhabitants in district #4, or part of the inhabitants reside outside the city limits.