**Robert LYTLE, Plaintiff,**

v.

**COMMISSIONERS OF ELECTION OF UNION COUNTY et al., Defendants.**

Civ. A. No. 74–237.

D. South Carolina,
Spartanburg Division.

**Thomas C. McCAIN et al., Plaintiffs,**

v.

**Charles E. LYBRAND et al., Defendants.**

Civ. A. No. 74–281.

D. South Carolina,
Greenwood Division.

United States District Court.
May 15, 1974.

David Ross Clarke, Mauldin, S. C., for plaintiff in Civ.A. No. 74–237.

Daniel R. McLeod, Atty. Gen., C. Tolbert Goolsby, Jr., Karen LeCraft Henderson, Asst. Attys. Gen., Columbia, S. C., Bruce W. White, Union, S. C., for defendants in Civ.A. No. 74–237.

Laughlin McDonald, Neil Bradley, Emily Carssow, American Civil Liberties Union, Atlanta, Ga., Epstein & McClain, Charleston, S. C., Melvin L. Wulf, New York City, for plaintiffs in Civ.A. No. 74-281.

Charles W. Coleman, Edgefield, S. C., Daniel R. McLeod, Atty. Gen., C. Tolbert Goolsby, Jr., Karen LeCraft Henderson, Asst. Attys. Gen., Columbia, S. C., for defendants in Civ.A. No. 74-281.

BLATT, District Judge.

In the above entitled actions, which are generally cognizable under 42 U.S.C., Section 1983, the plaintiffs seek a reapportionment of the eight-member Township Commission—(Union County, C/A 74-237)—and the five-member County Council—(Edgefield County, C/A 74-281).

In Civil Action No. 74-237—(hereinafter "Union County")—the cause of action has its genesis in an Act passed by the South Carolina Legislature in 1939, establishing the Union County Township Commission system—(338 South Carolina Joint Acts and Resolutions, p. 555)—under which Act Union County was then divided into eight townships of varying area and population. As a result of amendments thereafter enacted, it is now mandatory that one member of the Commission be elected to represent each of the eight townships and that such member be a resident of the township from which he is elected. While each member must reside in a particular township, all members are elected "at large", that is, all of the voters of Union County select the members of the Commission, not the voters alone in the township represented by a particular Commissioner. The plaintiff attacks this system solely on the "one-man, one-vote" theory enunciated in many decisions of the United States Supreme Court, commencing with Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); and Reynolds v. Simms, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); to the more recent cases of Avery v. Midland County, Texas, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968); and Hadley v. Junior College District, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970).

It appears in "Union County" that there is a population deviation of at least 432 per cent from the smallest population township to the largest population township, and the plaintiff contends that 21 per cent of the people of Union County, this being the percentage of citizens who live in the five smallest population townships, elect and control five of the eight township Commissioners and that any election scheme which allows such a result constitutes an invidious discrimination against those citizens who comprise the greater part of the electorate but are represented by a minority of the governing board. The plaintiff in "Union County" seeks a declaratory judgment holding the present system of election of Union County Township Commissioners to be violative of the rights of the plaintiff and others similarly situated, and he seeks an Order from this court delaying the election of Township Commissioners in the oncoming primary elections, now scheduled for July 16, 1974, and in the general election scheduled for November, 1974, until an appropriate reapportionment plan has been implemented which complies with the "one-man, one-vote" edict of the Supreme Court, said plan to be devised by this court, or effectuated by action of the General Assembly of South Carolina with approval of the United States Department of Justice under the provisions of the 1965 Voting Rights Act.

In Civil Action No. 74-281—(hereinafter, "Edgefield County")—the cause of action arises from an Act of the South Carolina Legislature passed originally in 1966 and amended in 1971—(§ 14-1850 of the 1962 Code of Laws of South Carolina, as amended)—establishing the Edgefield County Council, under which Act Edgefield County was divided into five districts of varying area and

population, with the identical residency requirement and "at-large" voting method as that under attack in the "Union County" case. "Edgefield County" differs in two factual respects from "Union County" insofar as population is concerned in that the maximum population deviation in the districts is only 72 per cent, and approximately 44 per cent of the population is required to elect three of the five Councilmen. Additionally, the plaintiffs in "Edgefield County" attack not only violation of the "one-man, one-vote principle," as does the plaintiff in "Union County", but the plaintiffs in "Edgefield County", all being black citizens of that county, contend that the election scheme there discriminates against them and other black citizens on account of their race. These plaintiffs seek substantially the same relief as that sought by the plaintiff in "Union County."

Focusing attention first on the "one-man, one-vote" principle under attack in both cases, the plaintiffs and the defendants move for summary judgment on this issue in each case under Rule 56 of the Federal Rules of Civil Procedure, and all parties have filed the necessary affidavits and supporting data upon which to base their respective motions.

Election plans based on "at-large" voting with residency clauses, such as are here involved, have been reviewed by various courts; but very few courts have faced the exact issues raised in the instant cases. The first case of consequence in this field was Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed. 2d 401 (1965), in which the United States Supreme Court upheld the use of an electoral system that combined multi-member districts and residency requirements, which system was used in the election of state senators in the State of Georgia. In that case, *there was no substantial population deviation in the senatorial districts involved,* and the Supreme Court stated, in upholding the residency requirement applicable to the large multi-district counties, beginning at page 436 of 379 U.S.:

"It is not contended that there is not 'substantial equality of population' among the 54 senatorial districts. The equal protection argument is focused solely upon the question whether county-wide voting in the seven multi-district counties results in denying the residents therein a vote 'approximately equal in weight to that of' voters resident in the single-member constituencies. Contrary to the District Court, we cannot say that it does. There is clearly no mathematical disparity. Fulton County, the State's largest constituency, has a population nearly seven times larger than that of a single-district constituency and for that reason elects seven senators. Every Fulton County voter, therefore, may vote for seven senators to represent his interests in the legislature. But the appellees assert that this scheme is defective because county-wide voting in multi-district counties could, as a matter of mathematics, result in the nullification of the unanimous choice of the voters of a district, thereby thrusting upon them a senator for whom no one in the district had voted. But this is only a highly hypothetical assertion that, in any event, ignores the practical realities of representation of a multi-member constituency. It is not accurate to treat a senator from a multi-district county as the representative of only that district within the county wherein he resides. The statute uses districts in multi-district counties merely as the basis of residence for candidates, not for voting or representation. Each district's senator must be a resident of that district, but since his tenure depends upon the county-wide electorate he must be vigilant to serve the interests of all the people in the county, and not merely those of people in his home district; thus in fact he is the county's and not merely the district's senator. If the weight of the vote of any voter in a Fulton County district, when he votes for seven senators to represent him in the

Georgia Senate, is not the exact equivalent of that of a resident of a single-member constituency, we cannot say that his vote is not 'approximately equal in weight to that of any other citizen in the State.'" *Fortson,* at 436, 437, 438.

Two years following the *Fortson* decision, the United States Supreme Court was faced with a relatively similar situation in Dusch v. Davis, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967). In the Dusch case, the Supreme Court was confronted with an election scheme analogous to that in *Fortson* and the instant cases. The City of Virginia Beach, Virginia, consolidated with adjoining Princess Anne County, which merger resulted in a combination of rural and urban areas, and a borough form of government was adopted. Under this plan, the new City of Virginia Beach, voting "at-large", elected eleven councilmen, seven of whom were required to reside in each of the city's seven boroughs, and four of whom were elected without regard to residency. Since the population of the seven boroughs ranged in number from 733 to 29,048 persons, this "Seven-Four Plan", as it was denominated, was attacked as violative of the "one-man, one-vote" concept. The Supreme Court, however, found the plan comparable to the scheme approved in *Fortson,* supra, and held that this "Seven-Four Plan" did not constitute "invidious discrimination."

"The Seven-Four Plan makes no distinction on the basis of race, creed, or economic status or location. Each of the 11 councilmen is elected by a vote of all the electors in the city. The fact that each of the seven councilmen must be a resident of the borough from which he is elected, is not fatal. In upholding a residence requirement for the election of state senators from a multi-district county we said in Fortson v. Dorsey, 379 U.S. 433, 438 [85 S.Ct. 498, 501, 13 L.Ed.2d 401]:

'It is not accurate to treat a senator from a multi-district county as the representative of only that district within the county wherein he resides. The statute uses districts in multi-district counties merely as the basis of residence for candidates, not for voting or representation. Each district's senator must be a resident of that district, but since his tenure depends upon the county-wide electorate he must be vigilant to serve the interests of all the people in the county, and not merely those of people in his home district; thus in fact he is the county's and not merely the district's senator.'

"By analogy the present consolidation plan uses boroughs in the city 'merely as the basis of residence for candidates, not for voting or representation.' He is nonetheless the city's, not the borough's, councilman. In *Fortson* there was substantial equality of population in the senatorial districts, while here the population of the boroughs varies widely. If a borough's resident on the council represented in fact only the borough, residence being only a front, different conclusions might follow. But on the assumption that Reynolds v. Sims controls, the constitutional test under the Equal Protection Clause is whether there is an 'invidious' discrimination. 377 U. S., at 561 [84 S.Ct. 1362, at 1381]. As stated by the District Court:

'The principal and adequate reason for providing for the election of one councilman from each borough is to assure that there will be members of the City Council with some general knowledge of rural problems to the end that this heterogeneous city will be able to give due consideration to questions presented throughout the entire area.'

.     .     .     .     .     .

'(T)he history—past and present—of the area and population now comprising the City of Virginia Beach demonstrates the compelling need, at least during an appreciable transition period, for knowledge of rural problems in handling the affairs of one of the largest area-wide cities

in the United States. Bluntly speaking, there is a vast area of the present City of Virginia Beach which should never be referred to as a city. District representation from the old County of Princess Anne with elected members of the Board of Supervisors selected only by the voters of the particular district has now been changed to permit city-wide voting. The "Seven-Four Plan" is not an evasive scheme to avoid the consequences of reapportionment or to perpetuate certain persons in office. The plan does not preserve any controlling influence of the smaller boroughs, but does indicate a desire for intelligent expression of views on subjects relating to agriculture which remains a great economic factor in the welfare of the entire population. As the plan becomes effective, if it then operates to minimize or cancel out the voting strength of racial or political elements of the voting population, it will be time enough to consider whether the system still passes constitutional muster.'

"The Seven-Four Plan seems to reflect a detente between urban and rural communities that may be important in resolving the complex problems of the modern megalopolis in relation to the city, the suburbia, and the rural countryside. Finding no invidious discrimination we conclude that the judgment of the Court of Appeals must be and is *reversed.*" *Dusch,* 387 U.S. at 115, 116, 117.

The defendants here contend that, in approving this "Seven-Four Plan", the Supreme Court gave its blessing to a scheme of operation with a maximum population deviation exceeding 365 per cent and these defendants urge that Dusch permits wide variances in population among districts within a political entity when the election process, even with residency requirements, involves at-large elections and when there are valid, noninvidious reasons for the formation of the particular residential districts. Thus, these defendants insist that the residency provisions of the Edgefield County and Union County plans are not unconstitutional under the "one-man, one-vote" mandate.

Following *Fortson* and *Dusch,* the United States Supreme Court decided Hadley v. Junior College District, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970), a case in which eight school districts in Kansas City, Missouri, combined to establish a consolidated Junior College District and to elect six trustees to conduct and manage the affairs of that district, a practice allowed under Missouri law. The trustees in this plan were required to be residents of the district from which they were elected and they were elected by the residents of their particular district, not under an at-large scheme. Because the plan discriminated in favor of certain of the smaller populated school districts, the Supreme Court held the plan to be unconstitutional and, in that connection, stated:

"In this particular case, the 'one-man, one-vote' principle is to some extent already reflected in the Missouri statute. That act provides that if no one or more of the component school districts has 33⅓% or more of the total enumeration of the junior college district, then all six trustees are elected at large. If, however, one or more districts has between 33⅓% and 50% of the total enumeration, each such district elects two trustees and the rest are elected at large from the remaining districts. Similarly, if one district has between 50% and 66⅔% of the enumeration it elects three trustees, and if one district has more than 66⅔% it elects four trustees. This scheme thus allocates increasingly more trustees to large districts as they represent an increasing proportion of the total enumeration.

"Although the statutory scheme reflects to some extent a principle of equal voting power, it does so in a way that does not comport with constitutional requirements. This is so

because the Act necessarily results in a systematic discrimination against voters in the more populous school districts. This discrimination occurs because whenever a large district's percentage of the total enumeration falls within a certain percentage range it is always allocated the number of trustees corresponding to the bottom of that range. Unless a particular large district has exactly 33⅓%, 50%, or 66⅔% of the total enumeration it will always have proportionally fewer trustees than the small districts. As has been pointed out, in the case of the Kansas City School District approximately 60% of the total enumeration entitles that district to only 50% of the trustees. Thus while voters in large school districts may frequently have less effective voting power than residents of small districts, they can never have more. Such built-in discrimination against voters in large districts cannot be sustained as a sufficient compliance with the constitutional mandate that each person's vote count as much as another's, as far as practicable. Consequently Missouri cannot allocate the junior college trustees according to the statutory formula employed in this case. We would be faced with a different question if the deviation from equal apportionment presented in this case resulted from a plan that did not contain a built-in bias in favor of small districts, but rather from the inherent mathematical complications in equally apportioning a small number of trustees among a limited number of component districts. We have said before that mathematical exactitude is not required, Wesberry, supra, 376 U.S. at 18, 84 S.Ct. 526, Reynolds, supra, 377 U.S. at 577, 84 S.Ct. 1362, but a plan that does not automatically discriminate in favor of certain districts is.

*"In holding that the guarantee of equal voting strength for each voter applies in all elections of governmental officials, we do not feel that the States will be inhibited in finding ways to insure that legitimate political goals of representation are achieved. We have previously upheld against constitutional challenge an election scheme that required that candidates be residents of certain districts that did not contain equal numbers of people. Dusch v. Davis, 387 U.S. 112 [87 S.Ct. 1554, 18 L.Ed.2d 656] (1967). Since all the officials in that case were elected at large, the right of each voter was given equal treatment." Hadley* at 56, 57, 58. (emphasis ours).

Because of the approval in *Hadley* of the *Dusch* principle, the defendants in both "Union County" and "Edgefield County" urge that the election scheme in each instance meets the constitutional requirements established in *Dusch* and reaffirmed in *Hadley*.

Counsel for plaintiffs and defendants in both cases, and this court in conducting its independent research, have uncovered only three cases in which the factual situation is identical to the cases here under review; two of these cases, Mayes v. Teague, 341 F.Supp. 254 (E. D.Tenn., 1972), and Davis v. Thomas County, 380 F.2d 93 (5 Cir., 1967), support the argument advanced by the defendants, while the third case, Keller v. Gilliam, 454 F.2d 55 (5 Cir., 1972), supports the argument of the plaintiffs.[1] In Davis v. Thomas County, in a brief opinion, the Court of Appeals for the Fifth Circuit, approved an election plan for the selection of eight members of the Board of Commissioners of Roads and Revenues of Thomas County, Georgia, in which this county was divided into five districts whose commissioners were chosen at-large but wherein, be-

---

1. Twiggs v. West et al., C/A Nos. 71–1106, 71–1123, and 71–1211 (D.C.S.C., 1971), involving the reapportionment of the State Senate of South Carolina, touches on but does not meet the issue here involved, and in Dessauer et al. v. England et al., C/A 70–1076, (D.C.S.C., 1970), the issue confronting this court was apparently decided without controversy or contest.

cause of residence requirements, one district with a population of 20,492 people was represented by only two commissioners, while the remaining four districts, with a total population of only 13,827, were represented by six commissioners. In affirming the dismissal of the complaint in that case by the District Court, the Court of Appeals for the Fifth Circuit, at page 94 of 380 F.2d, held that such dismissal was clearly vindicated by the opinion of the United States Supreme Court in *Dusch*. Likewise, the United States District Court for the Eastern District of Tennessee in Mayes v. Teague, upheld the constitutionality of a plan to elect a County Board of Education of seven members, one of whom was required to live in each of seven school districts, which varied in population from 450 to 2,353 people, but who were elected at-large by the entire county. The District Court, basing its holding on *Dusch* and *Fortson*, found the plan constitutionally acceptable and distinguished *Hadley* in that *Hadley* did not provide an "at-large" plan for voting. However, the District Court in *Mayes* cited that part of *Hadley* reaffirming the principle of *Dusch*, as additional authority for its decision that the plan in *Mayes* met constitutional muster.

In January, 1972, four and one-half years after the Fifth Circuit Court of Appeals opinion in *Davis*, and two months prior to the District Court's opinion in *Mayes,* the Fifth Circuit Court of Appeals decided Keller v. Gilliam, which case, *on identical facts,* reversed the holding in *Davis* without ever mentioning *Davis* in the opinion.[2] In *Keller,* the District Court, in fashioning a plan to replace a scheme that it had held to be unconstitutional involving the election of a Board of Supervisors for Lowndes County, Mississippi, divided the county into five districts and directed that the new Board of Supervisors be elected at-large with the requirement

that each elected supervisor be a resident of one of the five districts. Three of these districts contained only 27.3 per cent of the population of the county and, thus, a majority of the Board would represent a small minority of the residents of Lowndes County. Furthermore, the population variance from the largest to the smallest district was 24,849 to 2,213 persons. In rejecting this plan of the District Court, the Court of Appeals for the Fifth Circuit adopted the view that the principles enunciated in *Fortson* and *Dusch,* so strongly relied upon by the defendants here, must be read within the factual setting peculiar to those two cases.

"It must be borne in mind that we do not have here a case in which a number of candidates are to be chosen from several *equally* populated districts but are to be voted on by all of the voters of the governmental body, such as was dealt with in the statement of the Supreme Court in Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). The court found no cause for criticism of an at large vote by all of the electors of a county for more than one senator, so long as one senator was required to stand for election from each of the separate districts. No attack was made in Fortson v. Dorsey on the equality of the population of the different districts.

"Neither do we have a case similar to Dusch v. Davis, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967), where there was a city council election in the newly consolidated city of Virginia Beach (formerly consisting of the city of Virginia Beach and all of the rest of Princess Anne County, Virginia) under what was known as the 'seven-four plan'. This plan required that there should be an eleven man council to be elected at large by all the voters in the city's seven boroughs; four of

---

2. Oddly enough, the District Court in *Mayes* did not cite in its opinion either *Davis* or *Keller*, a readily understandable fact in view of the confusion created by these two entirely different decisions from the Fifth Circuit on an identical factual matter.

the councilmen could reside anywhere in the city, but each of the other seven had to live in a different one of the seven boroughs. These boroughs range in population from several hundred to 38,000 in size. The Supreme Court reversed the action of the Court of Appeals for the Fourth Circuit, which had held the plan was contrary to the 'true thrust' of the 'one-man, one-vote' principle of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) and 'its kin'.

"What was clear in the Virginia Beach (*Dusch*) case is that there was no combination by which representatives residing in the districts comprising a minority of the population could combine to work their will over the majority residing in the heavier populated precincts, except with the concurrence of some of the four councilmen who could reside in any of the boroughs and who were elected at large. Quite the contrary is obviously true here. The three smallest (coincidentally, also rural, as distinguished from urban) districts have a total population of just over 22% of the county. Thus, the three supervisors resident in them can prevail in any vote of a five-member Board. The other two supervisors who reside in the remaining two districts could not prevail on any Board vote, although possessing nearly three-fourths of the population of the county.

"We note that the Supreme Court drew attention to this special circumstance by quoting from the decision of the district court, which had approved the plan. 'The plan does not preserve any controlling influence of the smaller boroughs . . . .' Moreover, in footnote 5 the court says, 'It is obvious that, if the percentage of qualified voters is in accord with the population, Lynnhaven and Bayside (the two most populous boroughs), if united in their efforts, could elect all 11 councilmen even though the election were at large'. It is equally true that Lynnhaven and Bayside, either with or without Kempsville (another populous borough) could elect a clear majority of the councilmen by adding their three to the four to be chosen at large. Thus, it is clear, that there was no opportunity in the Virginia City case for the thinly populated rural area to dominate the council as against the three or four predominately urban areas under the 'seven-four plan'.

"It is also significant that the court noted the finding by the district court to the effect that 'the history—past and present—of the area and population now comprising the city of Virginia Beach demonstrates the compelling need, *at least during an appreciable transition period,* for knowledge of rural problems and handling the affairs of one of the largest area-wide cities in the United States.' (emphasis added) It will be noted that the offices which are involved in the case before us here are the offices of county supervisors, the responsibilities of which have in no wise changed over the years. The supervisors continue to handle the county affairs involving both rural and urban areas." 454 F. 2d 56, 57.

■ This court, faced with a choice between the decisions in *Davis* and *Mayes* on the one hand, and *Keller* on the other, adopts the logic and reasoning advanced by the *Keller* court. Finding the population districts in Union County and Edgefield County of unequal proportion—(substantial equality being the basis for the approval of the plan in *Fortson*)—and finding neither rational nor compelling circumstances justifying the formation of the unequally populated districts—(such rational and compelling circumstances being the basis for the approval of the plan in *Dusch*)—this court is of the opinion that the residency provisions of the plans here involved are violative of the "one-man, one-vote" principle and are constitutionally unacceptable.

"(I)n holding that the guarantee of equal voting strength for each voter applies in all elections of governmental officials, we do not feel that the States will be inhibited in finding ways to insure that *legitimate political goals of representation are achieved.*" 397 U.S. 50, at 58. (emphasis ours)

"Legitimate political goals", if such existed in these cases, would lend support to the position of the defendants, but finding no such "goals" from the affidavits and supporting data submitted by the defendants, this court finds the rationale of *Keller* unanswerable, and the residency provisions in the two election plans under consideration unacceptable.

Because of the relief hereinafter provided, this court does not feel it appropriate or necessary at this time to reach the second contention advanced in "Edgefield County", that of racial discrimination, and, thus, purposely makes no finding on that issue in this Order.

Based on the foregoing, it is

■ Ordered, in Civil Action No. 74–237 (Lytle v. Commissioners of Election of Union County, et al.), that summary judgment is hereby granted to the plaintiff, and the defendants therein are hereby enjoined from holding any further elections for Union County Township Commission pursuant to the residency provision contained in 338 South Carolina Joint Acts and Resolutions, p. 555, as amended.

It is further ordered, in Civil Action No. 74–281, (McCain, et al. v. Lybrand, et al.), that summary judgment is hereby granted to the plaintiffs as to the first cause of action only, and defendants therein are hereby enjoined from holding any further elections for Edgefield County Council pursuant to the residency provision contained in § 14–1850 of the 1962 Code of Laws of South Carolina, as amended.

It is further ordered, that the primary and general elections for the year 1974 as provided by law for Union County Township Commission and Edgefield County Council shall be conducted with all candidates running at-large on a county-wide basis with no township or district resident requirement imposed on any candidate.

■ It is further ordered, that the defendants in each of the above entitled cases shall give public notice in a newspaper of general circulation in each county for a period of two weeks after receipt of this Order that any person wishing to file as a candidate for Union County Township Commission or Edgefield County Council under the terms of this Order shall have that right between twelve o'clock noon on June 3, 1974, and twelve o'clock noon on June 17, 1974, and the defendants herein shall make provision under applicable state law to accept such filings which might be made by any such candidates.

■ It is further ordered, to allow the defendants, if they be so advised, to seek reapportionment by legislative enactment, with approval of the Attorney General of the United States under the 1965 Voting Rights Act, rather than reapportionment by court edict, that the defendants shall present to this court on or before May 1, 1975, a plan for election of the Union County Township Commission and the Edgefield County Council which has been adopted by the South Carolina General Assembly, and approved by the Attorney General of the United States.

It is further ordered, if no legislatively enacted plan, approved by the Attorney General of the United States, is presented to this court by May 1, 1975, by the defendants, that this court shall at that time put into effect its own reapportionment plan after receiving suggested plans from both plaintiffs and defendants.

It is further ordered, that this court shall retain jurisdiction in each of these actions until constitutionally valid reapportionment plans for the Union County Township Commission and the Edgefield County Council have been adopted by

the defendants through legislative action, and approved by the Attorney General of the United States, and by this court, or until such time as this court devises and effectuates its own reapportionment plan, and such jurisdiction is retained in these cases for all appropriate purposes, including, but not limited to, the awarding of attorneys' fees to the successful parties if the same shall be proper in these circumstances.