TOWNSHIP OF FRANKLIN, IN THE COUNTY OF HUNTER-DON, A MUNICIPAL CORPORATION OF NEW JERSEY, CHARLES MATHEWS, AUGUST KNISPEL AND CHARLES A. PATKOCHIS, PLAINTIFFS-APPELLANTS, v. BOARD OF EDUCATION OF THE NORTH HUNTERDON RE-GIONAL HIGH SCHOOL, A BODY POLITIC AND COR-PORATE OF NEW JERSEY, NORMAN GATHANY, HUNTERDON COUNTY SUPERINTENDENT OF SCHOOLS AND FRED G. BURKE, STATE COMMISSIONER OF EDU-CATION, DEFENDANTS-RESPONDENTS.

Argued March 21, 1977—Decided September 22, 1977.

*Mr. Richard G. O'Brien* argued the cause for appellants (*Messrs. Bowers, Rinehart, Murphy and O'Brien,* attorneys).

*Mr. Wesley L. Lance* argued the cause for respondent Board of Education.

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for respondent State Commissioner (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Skillman,* of counsel; *Ms. Jane Sommer,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

PASHMAN, J. Plaintiff in this case, the Township of Franklin, challenges the apportionment of seats on the regional school board of the North Hunterdon Regional High School District. Essentially, it argues that the apportionment formula embodied in *N. J. S. A.* 18A:13-8, as applied to its district, violates the "one-person, one-vote" rule laid down by the United States Supreme Court. *See Reynolds v. Sims*, 377 *U. S.* 533, 84 *S. Ct.* 1362, 12 *L. Ed.* 2d 506 (1964).

## I.

Plaintiff commenced this action by filing a notice of appeal to the Appellate Division. *R.* 2:2-3(a)(2). It named as defendants the North Hunterdon Regional High School, the County School Superintendent and the State Commissioner of Education.[1] The suit was immediately challenged by the defendant board on two procedural grounds. The board argued first, that the suit was untimely because no appeal had been filed within 45 days of the Commissioner's order, *R.* 2:4-1, and second, that the plaintiff had failed to exhaust its administrative remedies before taking the appeal. The Appellate Division agreed and dismissed the appeal without making a decision on the merits. We granted plaintiff's petition for certification, 69 *N. J.* 74 (1975), and accepted its "Statement in Lieu of Transcript," supplemented by defendants' statement of facts, as the record on appeal.

■ Defendants' procedural contentions have not been pursued before this Court. Nevertheless, we conclude that

---

[1] Initially, plaintiff also contested the board's alleged failure to call a district referendum in order to determine the appropriate method of apportioning appropriations for school operating expenses between constituent districts. *N. J. S. A.* 18A:13-25. It questioned the constitutionality of the statute providing for such appropriations. The parties have stipulated to the dismissal of this issue without prejudice or costs.

these claims would not bar the Court from rendering a determination on the merits since the issues presented are of public importance and involve substantial constitutional questions. See *Jacobs v. State Highway Authority,* 54 *N. J.* 393, 396 (1969); *McKenna v. N. J. Highway Authority,* 19 *N. J.* 270, 276 (1955); *Holloway v. Pennsauken Tp.,* 12 *N. J.* 371, 375 (1953); *Nelson v. So. Brunswick Planning Bd.,* 84 *N. J. Super.* 265, 275 ‚(App. Div. 1964); *Wilbert v. De Camp,* 72 *N. J. Super.* 60, 68 (App. Div. 1962); *R.* 2:2–3(a)(3). Moreover, we are not faced in this case merely with an administrative regulation, but with the constitutionality of the apportionment statute itself.

## II.

Plaintiff argues that the current distribution of seats on the North Hunterdon Regional High School District School Board fails to adequately represent that municipality's population of 2,154.[2] It points out that it is represented on the fifteen member board by only one seat, while High Bridge, which has only a slightly higher population, 2,606, is allocated two seats. This results in a maximum deviation from population equality of 50.3% between the two municipalities, with Franklin Township having a variance of

_____

[2]All references to population are computed on the basis of an "apportionment population," and are the figures used in calculating the current distribution of seats on the board as provided by *N. J. S. A.* 18A:13–8(a). That figure is determined in each district by deducting institutional and military population from the total census population. Although not projected by this appeal, we entertain serious doubts whether such an exclusion is constitutional in light of what was said in *Mahan v. Howell,* 410 *U. S.* 315, 330, 93 *S. Ct.* 979, 35 *L. Ed.* 2d 320, 333–34 (1973), modified 411 *U. S.* 922, 93 *S. Ct.* 1475, 36 *L. Ed.* 2d 316 (1973); *Davis v. Mann,* 377 *U. S.* 678, 691, 84 *S. Ct.* 1441, 12 *L. Ed.* 2d 609, 617 (1964) and *Carrington v. Rash,* 380 *U. S.* 89, 85 *S. Ct.* 775, 13 *L. Ed.* 2d 675 (1965). As to the use of the Census in arriving at population figures, see *Connor v. Finch,* 431 *U. S.* 407, 97 *S. Ct.* 1828, 52 *L. Ed.* 2d 465, 475 at n. 13 (1977).

27.2% above the norm and High Bridge having a variance of 23.1% below the norm.[3]

As will be seen, the problems of apportioning seats on the Hunterdon regional school board while retaining local municipal lines are compounded by the unique physical characteristics of the region in which the Township of Franklin is located. Plaintiff is one of twelve constituent school districts which make up the North Hunterdon Regional High School District.[4] Counsel advised us that this is the largest number of constituent municipalities making up any single regional school district in this State, and possibly in the country. Moreover, these component municipalities have relatively small populations which are not equivalent in size; they range from 874 in Glen Gardner to a population of 4665 in Clinton Township. These municipalities, and the 25,412 persons in the district's "apportionment population," are spread over an area of 171.30 square miles.

The present statute was drafted specifically to meet North Hunterdon's apportionment problems. The sponsor's statement to the 1972 amendment to the act indicates that it was designed to deal with the problems of a district involving more than nine municipal members; the only district falling within that category was, and still is, North Hunterdon. Under the pre-existing apportionment formula the voter disparity would have been substantially greater. Although Franklin Township would have had a variance of only 1.7% from the norm, a maximum variance of 179.0% would have existed between Clinton Township and Glen Gardner.

[3]The "norm" refers to absolute voter equality. Thus, utilizing a 15 member board the norm would be represented by having one board seat for every 1,694 persons. *See infra* at 8, n. 6.

[4]The other members of the regional district are the Townships of Bethlehem, Clinton, Franklin, Lebanon, Tewksbury, and Union; and the Boroughs of Califon, Glen Gardner, Hampton, Lebanon, and High Bridge; and the Town of Clinton.

In an affidavit filed on behalf of defendants, Ernest Reock, one of the primary draftsmen of the present apportionment statute, *N. J. S. A.* 18A:13–8, stated that he had specifically considered the problems of North Hunterdon in arriving at the scheme. He noted that he had been asked to determine whether High Bridge's inclusion in the region would have affected adversely the statutory formula even though it had not yet been formally included in the region at that time. Reock also indicated that he had considered alternatives to the present scheme which would reflect populations in a more representative fashion on the board. Increasing the size of the board was rejected because it would have resulted in an unmanageably large board. Similarly, "at large" elections were ruled out because they failed to take into account local municipal lines.

The present legislation was devised in order to provide the least possible deviation from voter equality while retaining local subdivision boundaries. Thus, in order to arrive at an appropriate apportionment of seats on the board, it utilizes the method of equal proportions,[5] a variable board size, and grouping of contiguous municipalities into representative districts. Where representative districts are used, board members are elected at large from within that district. Utilizing this scheme the defendants arrived at the current distribution of seats, which was certified by the County Superintendent on November 6, 1972.[6] An election of board members was conducted on February 6, 1973.

---

[5]This method is explained in *New Jersey Legislative Reapportionment*, N. J. Dept. of Education at 10, and Schmeckebier, *Congressional Apportionment* (Brookings Institution 1941) at 22.

[6]Application of the statutory formula to North Hunterdon resulted in the following distribution of seats and relative deviations:

| Representative District | Members | Apportionment Population | Relative Deviation |
|---|---|---|---|
| Franklin Township | 1 | 2,154 | +27.2% |
| Glen Gardner | 2 | 3.645 | + 7.6% |
| Hampton | | | |

### III.

### A

Initially, defendants question the applicability of the one-person, one-vote principle to a local school board. Defendant school board asserts that this constitutional doctrine need not be applied to its apportionment problems; the State, on the other hand, argues that because the board's powers are both administrative and legislative in nature, a less rigorous application of the rule is warranted. Both positions are based on the decision in *Sailors v. Bd. of Education*, 387 *U. S.* 105, 87 *S. Ct.* 1549, 18 *L. Ed.* 2d 650 (1967).

While *Sailors v. Bd. of Education, supra,* might be taken as support for either of the positions advocated by the defendants, in light of more recent decisions we do not view *Sailors* as controlling. In that case the Court held that the one-person, one-vote rule was not applicable to a local county board of education. Its holding was predicated almost entirely on its conclusion that the board's powers there were administrative and not legislative in nature.[7]

But the test suggested in *Sailors* — whether the governmental unit in question exercised administrative or legisla-

| | | | |
|---|---|---|---|
| Bethlehem | | | |
| Clinton Town | 2 | 3,487 | + 3.0% |
| Union | | | |
| Lebanon Township | 3 | 4,041 | —20.5% |
| Tewksbury | 2 | 3,929 | +16.0% |
| Califon | | | |
| Clinton Township | 3 | 5,550 | + 9.2% |
| Lebanon Borough | | | |
| High Bridge | 2 | 2,606 | —23.1% |
| | 15 | 25,412 | |

[7]The board had power to appoint a county school superintendent, prepare an annual budget, levy taxes and distribute those which were delinquent, take charge of educational programs and supervisory services, employ teachers and establish a school in the juvenile home.

tive power — was apparently short lived. In *Hadley v. Junior College District*, 397 *U. S.* 50, 90 *S. Ct.* 791, 25 *L. Ed.* 2d 45 (1970), the Court applied the one-person, one-vote test to a junior college district. It left little doubt that the applicability of that test should not rest on the criteria now advanced by the defendants:

> It has . . . been urged that we distinguish for apportionment purposes between elections for 'legislative' officials and those for 'administrative' officers. Such a suggestion would leave courts with an equally unmanageable principle since governmental activities 'cannot easily be classified in the neat categories favored by civics texts,' . . ., and it must also be rejected.
>
> [397 *U. S.* at 55–56, 90 *S. Ct.* at 795, 25 *L. Ed.* 2d at 50]

The Court did not expressly overrule *Sailors*, but it did appear willing to confine its holding strictly to the situation which was presented in that case. But see *Lo Frisco v. Schaffer*, 341 *F. Supp.* 743, 747 (D. Conn. 1972), aff'd 409 *U. S.* 972, 93 *S. Ct.* 313, 34 *L. Ed.* 2d 236 ,(1972) (concluding that *Hadley* "somewhat superseded *Sailors*"). In *Hadley* the Court referred to the decision in *Sailors*, noting that it had "also held that where a State chooses to select members of an official body by appointment rather than election, and that choice does not itself offend the Constitution, the fact that each official does not 'represent' the same number of people does not deny those people equal protection of the laws." 397 *U. S.* at 58, 90 *S. Ct.* at 796, 25 *L. Ed.* 2d at 52. Since the present board members are elected, and not appointed, we conclude that any viability which *Sailors* may have remaining should not affect the outcome in this case.

Moreover, both the language and the holding in *Hadley* suggest application of the one-person, one-vote principle here. Significantly, the Court found that the board's powers there "certainly show that the trustees perform important government functions within the districts, and . . . are general enough and have sufficient impact throughout

the district to justify [applying the constitutional] principle . . . ."[8] Not only is there a substantial symmetry between the powers exercised there and by the board in this case, *see, e. g., N. J. S. A.* 18A:13–26 (power to issue bonds), *N. J. S. A.* 18A:13–15 (power to acquire property), but the Court left little doubt that the very nature of a local school board made it a proper subject of the constitutional principle. Justice Black wrote for the Court:

> It is of course possible that there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately effect different groups that a popular election in compliance with *Reynolds, supra,* might not be required, but certainly we see nothing in the present case that indicates that the activiites of these trustees fit in that category. *Education has traditionally been a vital governmental function, and these trustees, whose election the State has opened to all qualified voters, are governmental officials in every relevant sense of that term.*
>
> [397 *U. S.* at 56, 90 *S. Ct.* at 795, 25 *L. Ed.* 2d at 51; emphasis added][9]

*Hadley* also forecloses the State's contention that significantly greater disparities in voting power may be justified on the basis of the functions which the board performs. As we have already indicated, any such distinction between administrative and legislative functions has been undercut by the Court's decision in *Hadley.* Moreover, Jus-

---

[8]The trustees were empowered to "levy and collect taxes, issue bonds with certain restrictions, hire and fire teachers, make contracts, collect fees, supervise and discipline students, pass on petitions to annex school districts, acquire property by condemnation, and in general manage the operations of the junior college," 397 *U. S.* at 53, 90 *S. Ct.* at 794, 25 *L. Ed.* 2d at 49 ; footnote omitted.

[9]The Court's more recent decisions in *Salyer Land Co. v. Tulare Lake Basin Water Storage District,* 410 *U. S.* 719, 93 *S. Ct.* 1224, 35 *L. Ed.* 2d 659 (1973) and *Associated Enterprises v. Toltec Water Shed Improvement District,* 410 *U. S.* 743, 93 *S. Ct.* 1237, 35 *L. Ed.* 2d 675 (1973), are not contrary to the holding in *Hadley,* but rather fall within the exception envisioned in that case. See 410 *U. S.* at 728, 93 *S. Ct.* at 1229, 35 *L. Ed.* 2d at 666.

tice Black's opinion clearly disavowed any intention to draw a distinction in applying the rule between a local school board election and any state election. He wrote:

When a court is asked to decide whether a State is required by the Constitution to give each qualified voter the same power in an election open to all, there is no discernible, valid reason why constitutional distinctions should be drawn on the basis of the purpose of the election. *If one person's vote is given less weight through unequal apportionment, his right to equal voting participation is impaired just as much when he votes for a school board member as when he votes for a state legislator.* While there are differences in the powers of different officials, the crucial consideration is the right of each qualified voter to participate on an equal footing in the election process. It should be remembered that in cases like this one we are asked by voters to insure that they are given equal treatment, and from their perspective, *the harm from unequal treatment is the same in any election, regardless of the officials selected.*
[397 *U. S.* at 54–55, 90 *S. Ct.* at 794, 25 *L. Ed.* 2d at 50; emphasis added]

Finally, we note that in applying the one-person, one-vote rule to the board of education election involved in this case, we are following a clearly delineated line of authority which has concluded that such governmental bodies are limited by the strictures of this constitutional rule. In addition to *Hadley, see Avery v. Midland County,* 390 *U. S.* 474, 88 *S. Ct.* 1114, 20 *L. Ed.* 2d 45 (1968)(county commissioners court); *Baker v. Regional High School District No. 5,* 520 *F.* 2d 799 (2 Cir. 1975), *cert.* den. 423 *U. S.* 995, 96 *S. Ct.* 422, 46 *L. Ed.* 2d 369 (1975) (regional school district); *Cantwell v. Hudnut,* 419 *F. Supp.* 1301 (D. Ind. 1976)(special district performing broad range of activities including police and fire services); *Barnes v. Bd. of Directors, Mt. Anthony U. H. School District,* 418 *F. Supp.* 845 (D. Vt. 1976)(board of directors of school district).

## B

■ We also conclude that the facts of this case demonstrate that a prima facie violation of the Equal Protection

Clause exists. Although the Supreme Court has repeatedly asserted that mathematical formulas are an impermissible basis for determining whether an apportionment plan is constitutional, *see, e. g., Mahan v. Howell,* 410 *U. S.* 315, 329, 93 *S. Ct.* 979, 35 *L. Ed.* 2d 320, 333 (1973), modified 411 *U. S.* 922, 93 *S. Ct.* 1475, 36 *L. Ed.* 2d 316 (1973) ; *Roman v. Sincock,* 377 *U. S.* 695, 84 *S. Ct.* 1449, 12 *L. Ed.* 2d 620 (1964), it has steadily moved towards adopting a fixed *de minimis* standard for determining whether there has been a prima facie showing of a plan's validity. Maximum deviations in earlier cases of 9.9%, *White v. Regester,* 412 *U. S.* 755, 93 *S. Ct.* 2332, 37 *L. Ed.* 2d 314 (1973), and 7.83%, *Gaffney v. Cummings,* 412 *U. S.* 735, 93 *S. Ct.* 2321, 37 *L. Ed.* 2d 298 (1973), were held to be de minimis. These cases were taken as an indication that a State would have the burden of justifying any plan which resulted in maximum deviations which departed more than 10% from the norm. *See White v. Regester, supra,* 412 *U. S.* at 776–77, 93 *S. Ct.* at 2344–45, 37 *L. Ed.* 2d at 331 (Brennan, J., concurring and dissenting) ; Casper, "Apportionment and the Right to Vote: Standards of Judicial Scrutiny," 1973 *The Supreme Court Review* 1. This term the Court confirmed the use of a 10% figure in determining whether plaintiff has met his burden of showing that a departure from strict voter equality is not *de minimis.* In considering maximum deviations of 16.5% and 19.3% in the Mississippi State Legislature, Justice Stewart stated that "they substantially exceed the 'under-10%' deviations the Court has previously considered to be of prima facie constitutional validity. . . ." *Connor v. Finch,* 431 *U. S.* 407, 418, 97 *S. Ct.* 1828, 1835, 52 *L. Ed.* 2d 465, 476 (1977).

In the instant case the maximum deviation between municipalities is 50.3%. This figure reflects deviations in Franklin Township and High Bridge of 27.2% and 23.1%, respectively, from the norm. It is clearly beyond the 10% deviation designated by the Court as constituting a *de minimis* departure from voter equality and any deviation upheld

by the Court. *Compare Mahan v. Howell, supra* ,(upholding a deviation of 16.4%), and *Abate v. Mundt,* 403 *U. S.* 182, 91 *S. Ct.* 1904, 29 *L. Ed.* 399 (1971) (upholding deviation of 11.9%), *with Kilgarlin v. Hill,* 386 *U. S.* 120, 87 *S. Ct.* 820, 17 *L. Ed.* 2d 771 (1967), reh. den. 386 *U. S.* 999, 87 *S. Ct.* 1300, 18 *L. Ed.* 2d 352 (1967) (striking down deviation of 26.48%) ; *Swann v. Adams,* 385 *U. S.* 440, 87 *S. Ct.* 569, 17 *L. Ed.* 2d 501 (1976).(striking down deviations of 33.55% and 25.65%). We therefore find that the State has the burden of justifying the necessity for retaining the present apportionment formula embodied in *N. J. S. A.* 18A:13-8. *Kilgarlin v. Hill, supra,* 386 *U. S.* at 122, 87 *S. Ct.* at 821, 17 *L. Ed.* 2d at 774; *Jackman v. Bodine,* 55 *N. J.* 371 (1970), *cert.* den. 400 *U. S.* 849, 91 *S. Ct.* 39, 27 *L. Ed.* 2d 87 (1970).

*C*

█ Essentially, defendants offer two justifications for the present scheme. First, they argue that the relatively small populations involved in the municipalities comprising the North Hunterdon district necessarily result in large deviations from strict voter equality. Although they admit that less dilution of voter equality could be obtained if local boundary lines were less rigidly followed, they argue that · retention of such lines is a permissible interest which justifies the present results. Second, they contend that greater deviations are tolerable where the plan concerns a local subdivision such as that involved in this case. We recognize that these interests are legitimate, and would, under appropriate circumstances, justify some deviation from the requirement that each vote be accorded equal weight. However, we hold that these reasons provide an insufficient justification for upholding an apportionment scheme which yields such a great disparity between representative districts.[10]

---

[10]Admittedly, there has been some confusion in determining whether a "rational" or a "compelling" state interest is required of the State

Certainly the State may have a legitimate interest in retaining local municipal lines in apportioning seats on the North Hunterdon board. The Court has on various occasions commented that the needs of a local community may sometimes justify departures from strict equality. *See Lockport v. Citizens For Community Action,* 430 U. S. 259, 97 S. Ct. 1047, 51 L. Ed. 2d 313, 323 (1977); *Abate v. Mundt, supra,* 403 U. S. at 185, 91 S. Ct. at 1906, 29 L. Ed. 2d at 402–03. In the instant case, we readily concede that by allowing each community, or contiguous communities, to choose a representative for the board, it is more probable that he will be known to the constituency which he must serve. It becomes easier to make grievances known to one's

in meeting its burden of justifying a plan which has a maximum deviation of greater than 10%. See Note, "Property Qualifications for Voting in Special Purpose Districts: Beyond the Scope of 'One Man-One Vote,'" 59 *Cornell L. Rev.* 687, 706–07 (1974). Traditionally, a compelling state interest was required where the right to vote was impaired. *City of Phoenix v. Kolodziejski,* 399 U. S. 204, 90 S. Ct. 1990, 26 L. Ed. 2d 523 (1970); *Cipriano v. City of Houma,* 395 U. S. 701, 89 S. Ct. 1897, 23 L. Ed. 2d 647 (1969); *Kramer v. Union Free School District,* 395 U. S. 621, 89 S. Ct. 1886, 23 L. Ed. 2d 583 (1969). This result was predicated on the fundamental nature of the right involved. However, in apportionment cases the Court has at times suggested that at least some dilution of the right to vote might be permissible if it were "'based on legitimate considerations incident to the effectuation of a rational state policy.'" *Connor v. Finch, supra,* 431 U. S. 407 at 418, 97 S. Ct. 1828 at 1835, 52 L. Ed. 2d at 476, quoting *Reynolds v. Sims, supra,* 377 U. S. at 579, 84 S. Ct. at 1390, 12 L. Ed. 2d at 537, and *Mahan v. Howell, supra,* 410 U. S. at 325, 93 S. Ct. at 985, 35 L. Ed. 2d at 330.

One way to logically reconcile the Court's positions would be to reject a strict dichotomy between rational and compelling reasons for an apportionment plan. Rather than treat all deviations under a single standard, the State's justification for a deviation from voter equality should reflect the degree to which it departs from the Court's 10% standard. There is some support for this in the Court's statement in *Mahan v. Howell, supra,* that

a State's policy urged in justification of disparity in district population, however rational, cannot, constitutionally be permitted to emasculate the goal of substantial equality.

[410 U. S. at 326, 93 S. Ct. at 986, 35 L. Ed. 2d at 331]

chosen representative; a board member will be more likely to be aware of individual's concerns and local needs; and finally, a candidate has an easier task in trying to reach all voters through local campaigning. Moreover, we recognize that mathematically equal representation is more difficult when there are relatively small populations involved.

But these arguments are only sufficient to justify allowing slight deviations from equality. Thus, in *Abate v. Mundt, supra,* the Court considered very similar arguments in ruling on the validity of an apportionment plan for a county legislature. Although the Court allowed a maximum deviation of 11.9%, it clearly announced that such justifications could be of only limited utility. Justice Marshall, writing for the Court, observed that "a desire to preserve the integrity of political subdivisions" coupled with the facts that

local legislative bodies frequently have fewer representatives than do their state and national counterparts and that some local legislative districts may have a much smaller population than do congressional and state legislative districts, lend support to the argument that *slightly greater percentage deviations may be tolerable* for local government apportionment schemes, . . . .
[403 *U. S.* at 185, 91 *S. Ct.* at 1907, 29 *L. Ed.* 2d at 402–03; emphasis added]

Moreover, after noting that the decision there was based on the particular characteristics of that governmental unit, he stated:

nothing we say today should be taken to imply that even these factors could justify substantially greater deviations from population equality.
[*Id.* at 187, 91 *S. Ct.* at 1908, 29 *L. Ed.* 2d at 403–04]

Virtually the same thought was expressed in the Court's most recent decision dealing with apportionment problems, *Connor v. Finch, supra.* Justice Stewart wrote:

Recognition that a State may properly seek to protect the integrity of political subdivisions or historical boundary lines permits no more than "minor deviations" from the basic requirement that legislative districts must be "as nearly of equal population as is practicable."
[431 *U. S.* at 419, 97 *S. Ct.* at 1836, 52 *L. Ed.* 2d at 477]

And our own Court has disputed just as vigorously the contention that local boundary lines could be used to justify substantial departures from the one-person, one-vote rule. In *Jackman v. Bodine, supra,* Chief Justice Weintraub explained that "the municipal ward, although conceivably useful with respect to the problem of gerrymandering, does not for that reason, or for any other reason, advance the purpose of apportionment sufficiently to justify population inequality, . . ." 55 *N. J.* at 383. He added: "no deviation will be defensible on that account." *Id.*

There is even less reason in this case than in most for allowing a concern for retaining local subdivisions to control. While the North Hunterdon region may be relatively large, 171.30 square miles, the school board is not faced with the task of reconciling the potentially competing interests which might be found in a governmental body exercising statewide powers.[11] There are no inner-city areas whose local needs are distinguishable from those of the area as a whole; and because various communities have small populations, a candidate is more likely to be able to reach his constituency even though he is required to campaign outside of his hometown. Hence, we cannot conclude that the State has shown a sufficient reason for upholding the substantial deviation inherent in this plan.

## IV.

This Court is certainly not the proper body to devise a new apportionment plan, except as a last resort. *Jackman v. Bodine,* 43 *N. J.* 453, 473 (1973). The Legislature brings to the problem at hand the requisite knowledge necessary to devise an apportionment scheme which

---

[11]Significantly, the school board in this case does not even handle all educational functions for the regional district, but is limited to administration of the secondary school program. There is a general school district in each municipality which is responsible for education of the first nine grades of school.

hopefully will satisfy the political needs of the region involved. In assessing the relative merits of a plan devised by a federal court, as opposed to a state legislature, Justice Stewart recently remarked that

a state legislature is the institution that is by far the best situated to identify and then reconcile traditional state policies within the constitutionally mandated framework of substantial population equality. The federal courts by contrast possess no distinctive mandate to compromise sometimes conflicting state apportionment policies in the people's name.

> [*Connor v. Finch*, 431 *U. S.* at 414–415, 97 *S. Ct.* at 1833, 52 *L. Ed.* 2d at 473–474]

Accordingly, we hold that the present scheme is invalid and *N. J. S. A.* 18A:13–8 is unconstitutional as applied to the North Hunterdon regional school district. We expect the Legislature to devise an apportionment formula consistent with the Constitution so that a legally constituted board may be elected in February 1978. Until a suitable plan is devised, the present members of the North Hunterdon Regional School Board shall continue in office.

*For reversal*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.

*For affirmance*—None.