21 A.3d 657 (2010)
420 N.J. Super. 365
BOROUGH OF ROCKY HILL, Rocky Hill Board Of Education, Millstone Borough Board of Education and Janine Lacava (an individual taxpayer from the Borough of Rocky Hill), Plaintiffs,
v.
STATE of New Jersey, New Jersey Department of Education, and County Executive Superintendent of Somerset County, Defendants.
Docket No. C-12051-09
Superior Court of New Jersey, Chancery Division, Somerset County.
Decided September 24, 2010.
*660 Matthew J. Giacobbe, Lyndhurst, for plaintiffs (Scarinci Hollenbeck, attorneys).
Michael C. Walters, Deputy Attorney General for defendants (Paula T. Dow, Attorney General, attorney; Michelle Lyn MiUer, Assistant Attorney General, on the brief).
ACCURSO, P.J.Ch.
Plaintiffs, Borough of Rocky Hill (hereinafter "Rocky Hill"), the Rocky Hill Board of Education (hereinafter "Rocky Hill BOE"), Millstone Borough Board of Education (hereinafter "Millstone BOE") and Janine Lacava, an individual taxpayer residing in Rocky Hill and formerly President of the Rocky Hill BOE (hereinafter "Lacava"), have brought this action against defendants, the State of New Jersey, the New Jersey Department of Education and the Executive County Superintendent of Somerset County (hereinafter "ECS") challenging the constitutionality of L. 2009, c. 78, which effectively abolished the Rocky Hill and Millstone Boards of Education and eliminated these two school districts. The matter is before the court on cross-motions for summary judgment. The parties agree that there is no dispute as to any material fact and that the questions before the court are legal ones not requiring an evidentiary hearing.

The School Districts
Both Rocky Hill and Millstone have for many years maintained "non-operating" school districts, meaning that neither district operated a school and that both sent their district's children to schools in neighboring districts pursuant to voluntary agreements. Rocky Hill is a small borough (.64 square miles) in the southeast corner of Somerset County, having a population of approximately 675. Prior to July 1, 2009, the effective date of the challenged legislation, it had a Pre-K to grade 12 school district in a long standing send-receive relationship with Montgomery Township. Montgomery is located just north of Rocky Hill. The Township is thirty-two square miles and has a population of approximately 23,000. Both Montgomery and Rocky Hill had Type II districts with elected boards whose members had staggered three-year terms. During the 2008-2009 school year, Rocky Hill sent all of its ninety-six Pre-K to 12th grade students to school in Montgomery, paying the district a fixed per-pupil cost. Rocky Hill's 2008-2009 budget was approximately $1,466,000. Over 92% of that sum, approximately $1,355,000, was raised through local taxes.
Millstone Borough is the smallest municipality in Somerset County. It is slightly larger than one-half square mile and is located in the south, central part of the County, between Hillsborough and Franklin *661 Townships. Millstone has a population of 410. A Pre-K to grade 12, Type II district. Millstone had for many years sent its students to the neighboring district in Hillsborough pursuant to a send-receive agreement between the districts. Hillsborough Township is the largest municipality (measured by area) in Somerset County. Hillsborough's population is roughly 38,500. Like Millstone, Hillsborough was a Pre-K to grade 12, Type II district with an elected board, the members serving staggered three-year terms. For the 2008-2009 school year. Millstone's budget for the sixty-six Millstone students attending Hillsborough schools was approximately $862,000. Over 67% of that sum, approximately $582,000, was raised from the general levy. Rocky Hill and Millstone were the County's only non-operating school districts.

The Legislation
The current controversy has its genesis in legislation passed in 2007 designed to encourage financial accountability among local government units by reducing duplicative services and "clearing legal hurdles to shared services and consolidation." L. 2007, c. 43 (now codified at N.J.S.A. 40A:65-1 to 35). The 2007 legislation, known as the Uniform Shared Services and Consolidation Act, created the office of Executive County Superintendent (ECS) charged generally, as relevant to this matter, with promoting administrative and operational efficiencies and cost savings within the districts and, specifically, with the authority to eliminate districts not operating schools as of April 3, 2007, in accordance with a plan to be submitted to the Commissioner of Education. N.J.S.A. 18A:7-8.
The challenged legislation, L. 2009, c. 78 (now codified at N.J.S.A. 18A:8-43 to 51 and amending N.J.S.A. 18A:7-8), builds on the 2007 legislation, restating the mandate for the elimination and merger of all non-operating school districts and providing for post-merger allocation of appropriations and district governance. The statute, which was introduced on June 22, 2009, passed on June 25, 2009, and signed by the Governor on June 30, 2009, effective immediately, provides in pertinent part:
SYNOPSIS: An Act concerning non-operating school districts, supplementing Title 18A of the New Jersey Statutes, and amending N.J.S. 18A:7-8.
C.18A:8-43 "Non-operating district" defined.
1. As used in this act: "Non-operating district" means a school district that is not operating schools on the effective date of P.L.2009, c. 78 (C.18A:8-43 et al.) [June 30, 2009].
C.18A:8-44 Elimination of non-operating district through merger.
2. a. Except as otherwise provided in subsection b. of this section, the executive county superintendent of schools shall eliminate any non-operating district and merge that district with the district with which it participates in a sending-receiving relationship.
b. If a non-operating district is in a sending-receiving relationship with more than one district or is in a sending-receiving relationship with a district in need of improvement pursuant to the "No Child Left Behind Act of 2001," Pub.L. 107-110, then the executive county superintendent shall determine with which district the non-operating district shall be merged. The determination shall be based on the district that is able to accommodate the merger with the least disruption to its finances and educational operations. In making the determination the executive county superintendent shall examine, *662 but need not be limited to, the following factors: current sending-receiving relationships; the quality and effectiveness of educational programming and district operations; proximity of school districts; transportation costs; school building capacity; and special education needs.
C.18A:8-45 Apportioning of annual or special appropriations.
3. The annual or special appropriations for a new district established pursuant to section 2 of this act, excluding the amounts to be raised for interest upon and the redemption of bonds payable by the district, shall be apportioned among the constituent districts of the new district in the first year of the merger in such manner as the commissioner determines to be the least fiscally disruptive. Thereafter the apportionment methodology shall be determined pursuant to chapter 13 of Title 18A of the New Jersey Statutes; however, if necessary, the commissioner may allow a five-year phase-in of the apportionment methodology.
The amount to be raised for interest upon and the redemption of bonds payable by the district for bonds issued prior to and after the effective date of this act, shall be apportioned among the constituent districts of the new district in such manner as the commissioner determines to be the least fiscally disruptive. The commissioner may allow a five-year phase-in of the apportionment methodology, if necessary.
C.18A:8-46 Calculation of State aid.
4. Notwithstanding the provisions of P.L.2007, c. 260 (C.18A:7F-43 et al.) to the contrary, for the purposes of calculating State school aid, both the former non-operating district and the district with which it is merged pursuant to the provisions of section 2 of this act shall continue to be considered separate school districts.
C.18A:8-47 Board of education of newly-formed district; membership.
5.a. If the district with which the non-operating district is merged is a Type II district without a board of school estimate, except as otherwise provided in this subsection, the new district established pursuant to section 2 of this act shall have a board of education with the same number of members as the board of education of the district with which the non-operating district has been merged. The members of the board of education of the district with which the non-operating district has been merged shall continue in office as members of the first board of education of the new district until the expiration of the respective terms for which they were elected.
In any year in which the term of a member of the board of education of the new district expires, his successor shall be elected at-large by the voters of the new district.
The executive county superintendent shall, not later than 30 days after the merger of the districts, appoint one member of the board of education of the former non-operating district to the board of the new district, who shall serve until the first Monday succeeding the first annual school election in which a member of the board of education of the new district is elected at-large; except that if the former non-operating district had representation on the board of education of the district with which it has been merged pursuant to section 2 of P.L. 1995, c. 8 (C.18A:38-8.2), then that representative shah be the person appointed *663 by the executive county superintendent. The member appointed by the executive county superintendent shall be a voting member of the board.
b. If the district with which the non-operating district is merged is a Type I district, the new district shall have a board of education with the same number of member's as the board of education of the district with which the non-operating district has been merged plus one additional member. The mayor or other chief executive officer of the municipality in which the former non-operating district is located shall appoint the one additional member.
c. If the district with which the non-operating district is merged is a regional district, the former non-operating district shall be treated as a constituent district of the regional district and the membership of the board of education of the new district shall be in accordance with the provisions of chapter 13 of Title 18A of the New Jersey Statutes.
. . . .
C.18A:8-50 Governing of new district.
8. Unless otherwise provided in this act, a new district formed pursuant to section 2 of this act shall be governed by the provisions of chapter 13 of Title 18A of the New Jersey Statutes.
C.18A:8-51 Construction of act.
9. Nothing in this act shall be construed to prohibit an executive county superintendent from including a former non-operating district in the consolidation plan submitted by the executive county superintendent to he commissioner pursuant to subsection h. of N.J.S.18A:7-8.
10. N.J.S. 18A:7-8 is amended to read as follows:
General powers and duties.
18A:7-8. Each executive county superintendent shall:
. . . .
d. Promote administrative and operational efficiencies and cost savings within the school districts in the county while ensuring that the districts provide a thorough and efficient system of education;
. . . .
g. Eliminate districts located in the county that are not operating schools on the effective date of P.L.2009, c. 78 (C.18A:8-43 et al.), [June 30, 2009] in accordance with a plan and schedule included in the plan submitted to and approved by the commissioner;
. . . .
11. This act shall take effect immediately.
[P.L. 2009, c. 78, (codified at N.J.S.A. 18A:8-43 to 51 and as amended at N.J.S.A. 18A:7-8).]
The Elimination and Merger of the Districts
On June 30, 2009, the Commissioner of Education issued decisions on thirteen[1] of the State's non-operating school districts, in each instance accepting the recommendation of the Executive County Superintendent to eliminate the non-operating district. See http://www.state.nj.us/education/ counties/ (last visited April 11, 2011). *664 With regard to Rocky Hill and Millstone, Somerset County's Executive County Superintendent, Trudy Doyle, prepared separate reports for each district analyzing and comparing each district against its send-receive partner and making recommendations to the Commissioner for the allocation of tax levies for each combined new district.
For Rocky Hill, the ECS recommended that the district be eliminated as of July 1, 2009, and that the district's ninety-six students continue to be educated in Montgomery. The ECS proposed that the Rocky Hill pupils be counted as resident students in the Montgomery district for the 2009-2010 school year but that Rocky Hill and Montgomery continue to be considered separate school districts for purposes of calculating State aid. The ECS recommended a general fund tax levy apportionment for the 2009-2010 year comprised of 38.5% equalized valuations and 61.5% enrollment in order to match the districts' 2009-2010 actual general fund tax levies of $1,310,920 for Rocky Hill and $60,629,655 for Montgomery, thereby meeting the statute's requirement that the first year's apportionment be accomplished in the least fiscally disruptive manner. N.J.S.A. 18A:8-45. The ECS recommended that the same apportionment be continued for the 2010-2011 school year and thereafter. Finally, the ECS recommended that in accordance with the new law, the combined district go forward with an elected board consisting of nine members having staggered three-year terms. Within thirty days of the merger, the ECS would appoint a member of the Rocky Hill BOE to the existing Montgomery BOE who would serve as a voting member of the BOE of the newly combined district until the next annual school election. The Montgomery BOE members would each continue to serve out their terms as members of the newly combined district BOE. All seats on the new nine-member BOE are to be elected at-large by the voters of the newly combined district.
For Millstone, the ECS recommended that the district be eliminated as of July 1, 2009, and that the district's sixty-six students continue to attend school in the Hillsborough School District. The ECS proposed that the Millstone students be counted as resident students in the Hillsborough district for the 2009-2010 school year but that Millstone and Hillsborough continue to be considered separate school districts for purposes of calculating State aid. After reviewing the equalized valuations and student enrollment for Millstone and Hillsborough, the ECS concluded that there was no combination of equalized enrollment that would result in the same levy allocation as in 2009-2010, that is, $789,560 for Millstone and $72,299,019 for Hillsborough. In order to meet the new law's mandate that the first year apportionment of tax levies be conducted in the least fiscally disruptive manner, the ECS recommended that for 2009-2010, Millstone raise $789,560 and Hillsborough raise $72,299,019, the same sums included in their 2009-2010 budgets certified for taxes. Thereafter, the ECS recommended a five-year phase-in to 50% equalized valuations and 50% enrollments.[2] Finally, the ECS recommended that the combined district go forward with an elected board consisting of nine members having staggered three-year terms. Within thirty days of the merger, the ECS would appoint a member of the Millstone BOE to *665 the existing Hillsborough BOE who would serve as a voting member of the BOE of the newly combined district until the next annual school election. The Hillsborough BOE members would each continue to serve out their terms as members of the newly combined district BOE. All seats on the new nine-member BOE are to be elected at-large by the voters of the newly combined district.
The Commissioner of Education, Lucille E. Davy, accepted the ECS's recommendations for both Rocky Hill and Millstone in their entirety on June 30, 2009 and approved the plans submitted by the Somerset County ECS for the merger of the Rocky Hill School District with the Montgomery Township School District and for the merger of the Millstone School District with the Hillsborough Township School District, effective July 1, 2009. This challenge followed.

Plaintiffs' Contentions
Plaintiffs contend that L. 2009, c. 78 violates the Equal Protection Clause of the United States Constitution and article I, paragraph 1 of the New Jersey Constitution by impermissibly infringing upon their constitutionally protected voting rights.[3] Specifically, plaintiffs contend that the challenged legislation violates the "one person, one vote" principle by denying the residents of Rocky Hill and Millstone permanent representation on the new Boards of Education. Plaintiffs further argue that without permanent representation on the new Boards of Education, the residents of these two former non-operating school districts endure "taxation without representation." Finally, plaintiffs maintain that L. 2009, c. 78 constitutes special legislation in violation of article IV, section 7, paragraph 9(7) of the New Jersey Constitution by excluding particular municipalities from involvement and management of the public schools to which they send their children.

The Equal Protection Claims
In order to succeed on this facial challenge to L. 2009, c. 78, plaintiffs must overcome the strong presumption of validity that attaches to acts of the Legislature. State Farm Mut. Auto. Ins. Co. v. State, 124 N.J. 32, 590 A.2d 191 (1991). Our Supreme Court has repeatedly cautioned that courts are to extend every possible presumption in favor of a statute's constitutionality and that only legislative enactments that are clearly repugnant to the Constitution are to be declared void. Paul Kimball Hosp. v. Brick Twp. Hosp., 86 N.J. 429, 446-47, 432 A.2d 36 (1981). Because this is a facial challenge to the statute, its effect on plaintiffs is not dispositive; rather, the question is whether the "mere enactment" of the statute offends constitutional rights. State Farm, supra, 124 N.J. at 46, 590 A.2d 191.
The Fourteenth Amendment commands that no state shall deny to any person within its jurisdiction the "equal protection" of the laws. Although article 1, paragraph 1 of the New Jersey Constitution *666 does not include these precise words, nevertheless, our Supreme Court has held that, like the Fourteenth Amendment, the clause seeks to protect "against the unequal treatment of those who should be treated alike" and thereby safeguards the values encompassed by the principle of equal protection. Greenberg v. Kimmelman, 99 N.J. 552, 568, 494 A.2d 294 (1985). Fundamental rights, such as those plaintiffs contend are implicated here, receive protection under both the state and federal constitutions but are analyzed differently. Federal equal protection analysis traditionally involves a tiered review whereas our courts have rejected that approach in analyzing such claims under New Jersey's Constitution. Instead, our courts employ a balancing test that considers the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction. Id. at 567, 494 A.2d 294.
Whether embarking on a state or federal analysis, the first step is to consider the nature of the right at issue. Ibid. Plaintiffs characterize their claim as being denied the right of representation on a local school board, which is granted to citizens in more populated municipalities but denied to citizens, such as those of Rocky Hill and Millstone, residing in less populated municipalities. There is, of course, no constitutional right in the voters of any size district to vote for a school board or for a school budget. In re Charter School Application, 320 N.J.Super. 174, 242, 727 A.2d 15 (App.Div.1999), aff'd as mod., 164 N.J. 316, 753 A.2d 687 (2000). Nevertheless, plaintiffs contend that L. 2009, c. 78, by denying the residents of Rocky Hill and Millstone permanent representation on the new Boards of Education, violates the "one person, one vote" principle and thus requires strict scrutiny by this court. Defendants contend that the nature of the right is more appropriately ascertained by first asking whether one person, one vote principles are offended by the creation of an at-large school district from two merged districts. Defining the nature of the right is the essential first step in New Jersey's balancing test and the "crucial consideration in characterizing a right as `fundamental,' the initial step in determining whether the governmental regulation will receive `strict scrutiny' or a more relaxed standard of judicial review" in a federal analysis. Greenberg, supra, 99 N.J. at 567, 494 A.2d 294.
The one person, one vote doctrine traces its origin to Baker v. Carr, 369 U.S. 186, 237, 82 S.Ct. 691, 720, 7 L.Ed.2d 663, 697 (1962), in which the United States Supreme Court held for the first time that challenges to state legislative apportionment schemes were justiciable under the Fourteenth Amendment. Simply stated, it requires that each citizen have an equally effective voice in the election of members of state legislatures, Reynolds v. Sims, 377 U.S. 533, 565, 84 S.Ct. 1362, 1383, 12 L.Ed.2d 506, 529 (1964) and local offices, Avery v. Midland County, 390 U.S. 474, 480, 88 S.Ct. 1114, 1118, 20 L.Ed.2d 45, 51 (1968). While there was once a question as to whether the doctrine applied to local school board elections, see Sailors v. Board of Education, 387 U.S. 105, 111, 87 S.Ct. 1549, 1553, 18 L.Ed.2d 650, 655 (1967), today, there is no question that it does. The Supreme Court explicitly extended the one person, one vote principle to the election of local school officials in Hadley v. Junior College District, 397 U.S. 50, 56, 90 S.Ct. 791, 795, 25 L.Ed.2d 45, 50-51 (1970) holding, as a general rule, that
whenever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that *667 each qualified voter must be given an equal opportunity to participate in that election, and when members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as practicable, that equal numbers of voters can vote for proportionately equal numbers of officials.
The principle of one person, one vote, therefore, clearly applies to the election of the members of the new Boards of Education and requires that, to the extent practicable, each qualified district voter's vote count as much as any other voter's. The State defendants readily agree. Although it may not be incumbent on a state to afford its citizens the right to vote for any particular official, once a state does so, and the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause. Harper v. Va. Bd. of Elections, 383 U.S. 663, 665, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169, 171 (1966). Further, statutes drawing such lines are ordinarily subject to strict scrutiny by the courts. Kramer v. Union Free Sch. Dist, 395 U.S. 621, 626, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583, 589 (1969) ("`Since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.'") (quoting Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506, 527 (1964)).
Against this backdrop, we again turn to consideration of the nature of the affected right. Plaintiffs claim that the principle of one person, one vote, entitles the residents of Rocky Hill and Millstone to permanent representation on the reconstituted school boards, relying on Township of Franklin v. Board of Education, 74 N.J. 345, 378 A.2d 218 (1977), cert. denied, 435 U.S. 950, 98 S.Ct. 1576, 55 L.Ed.2d 800 (1978) and English v. Board of Education of Boonton, 301 F.3d 69 (3d Cir.2002). Franklin involved an as-applied challenge to the apportionment of seats on the North Hunterdon Regional High School Board of Education. Franklin Township, as one of twelve constituent school districts making up the North Hunterdon Regional High School District, contended that its one seat on the fifteen person board was inadequate based on Franklin's population as compared to the populations of the other districts. Twp. of Franklin, supra, 74 N.J. at 348-49, 378 A.2d 218. While conceding the substantial deviations from population equality in the distribution of board seats, the State defended the statute creating the apportionment formula on the grounds that it produced the least possible deviation from voter equality while retaining local subdivision boundaries. Id. at 356, 378 A.2d 218. The Court struck application of the statute. Id. at 360, 378 A.2d 218. Although acknowledging the State's legitimate interests in retaining municipal lines in apportioning seats on the North Hunterdon Board, it held that local boundary lines could not be used to justify substantial departures from the one person, one vote rule. Id. at 357-59, 378 A.2d 218.
In English, supra, 301 F.3d at 83, another as-applied challenge to a school statute, the Third Circuit rejected an equal protection claim raised in the context of a send-receive relationship involving Lincoln Park and Boonton. Similar to the former send-receive relationships in this matter, Lincoln Park had for many years elected to send all of its high school students to neighboring Boonton High School, for which it paid the Boonton School District a tuition reflecting the actual cost of the students enrolled. Id. at 71. Unlike in this matter, however, the Lincoln Park *668 students constituted 52% of the Boonton High School population. Ibid. Despite having a majority of students in the high school, Lincoln Park was limited by the send-receive statute to only one seat on the ten member Boonton Board.[4]Ibid. English contended that the one seat limitation violated the one person, one vote command of the Equal Protection Clause. Ibid. The Third Circuit disagreed. Id. at 72. Relying on Holt Civic Club v. City of Tuscaloosa, 439 U.S. 60, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978), the court refused to accord the statute strict scrutiny, holding that one person, one vote was not implicated, as the residents of Lincoln Park had no right to vote in the election of Boonton's School Board. English, supra, 301 F.3d at 72. Reasoning that the principle of one person, one vote is not violated when residents of the suburban towns surrounding Philadelphia are denied the right to vote for Philadelphia's Mayor or City Council, the Circuit refused to hold that the right to vote in Boonton's school election had to be extended extraterritorially to Lincoln Park residents whose interests were affected by the decisions of the neighboring Boonton Board. Id. at 77.
Neither of these cases provides the slightest aid to plaintiffs here. Indeed, far from helping plaintiffs' cause, comparing the cases to the facts here demonstrates that plaintiffs' claims do not implicate the one person, one vote doctrine. The first thing to note is that both Franklin and English involved "as-applied" challenges in which the plaintiffs argued that they were underrepresented on their respective school boards by virtue of the population of their towns in comparison to other districts represented on their boards. The gravamen of the plaintiffs' claims in those cases was that the votes of their Board representatives were afforded less weight than they would have otherwise been through equal apportionment. Ordinarily, "as applied" cases such as these, in which the court must consider census figures and weigh what would be an allowable deviation from the norm of absolute voter equality, are of very limited utility in deciding a facial challenge to an apportionment statute. Here, however, they are helpful in evaluating the nature of the right plaintiffs claim has been infringed, that is, municipal representation on a school board.
In the typical apportionment challenge, the court is asked to evaluate a facially neutral apportionment scheme which allocates seats on a board, at least in part, on the basis of municipal boundaries. It is most often the Legislature's attempt to respect municipal boundaries, unobjectionable, even laudable, on its face, that when applied to towns of disparate sizes, results in equal protection violations of the one person, one vote principle. Franklin is just such a case. In Franklin, there was evidence in the record that the statute was designed by its draftsmen to provide the least possible deviation from voter equality while retaining local subdivision boundaries. The draftsmen had purposefully rejected "at large" elections because they failed to take account of local municipal lines. Township of Franklin, supra, 74 N.J. at 350, 378 A.2d 218. Acknowledging the State's legitimate interest in retaining local municipal lines in apportioning seats *669 on the North Hunterdon Board, Justice Pashman, writing for the Court noted:
[W]e readily concede that by allowing each community, or contiguous communities, to choose a representative for the board, it is more probable that he will be known to the constituency which he must serve. It becomes easier to make grievances known to one's chosen representative; a board member will be more likely to be aware of individual's concerns and local needs; and finally, a candidate has an easier task in trying to reach all voters through local campaigning. Moreover, we recognize that mathematically equal representation is more difficult when there are relatively small populations involved. But these arguments are only sufficient to justify allowing slight deviations from equality. [Id. at 357-58, 378 A.2d 218 (emphasis supplied).]
These are precisely the arguments that plaintiffs make here in asserting that the residents of Rocky Hill and Millstone must be guaranteed permanent representation on the newly consolidated boards. The cases make clear, however, that the nature of the constitutional right at issue is in the voter and not in any community or municipality. English, supra, 301 F.3d at 75. Our courts have long recognized the value that plaintiffs espouse in district representation. Nonetheless, there is no constitutional tenet that requires the Legislature to provide for municipal representation in fashioning a school district. The lesson from the apportionment cases is that when the Legislature chooses to employ municipal boundaries in creating voting districts, those boundaries must necessarily give way to voter equality in order to heed the command of the Equal Protection Clause that each citizen have an equal voice in the election. See McNeil v. Legislative Apportionment Comm., 177 N.J. 364, 828 A.2d 840 (2003) (municipal boundary requirement for Newark and Jersey City silently superceded for more than quarter of a century in order to preserve one person, one vote mandate), cert. denied, 540 U.S. 1107, 124 S.Ct. 1068, 157 L.Ed.2d 893 (2004); Jackman v. Bodine, 53 N.J. 585, 252 A.2d 209 (demand of one person, one vote may necessitate deviation from State Constitution's insistence that county and municipal lines be respected), cert. denied, 396 U.S. 822, 90 S.Ct. 63, 24 L.Ed.2d 73 (1969) (Bodine VII). Here, there can be no question but that Lacava's and, indeed, every voter's vote in the newly constituted districts necessarily counts as much as any other's, because the voting is "at-large." Scrimminger v. Sherwin, 60 N.J. 483, 489, 291 A.2d 134 (1972) (one man, one vote ideal that every man's vote should equal another's only attainable in election at-large). Thus it becomes apparent that plaintiffs' reliance on "as-applied" apportionment cases involving municipal underrepresentation cannot support their facial challenge to a statute that eschews municipal boundary lines and that the State defendants have more appropriately framed the question as whether one person, one vote principles are offended by the creation of an at-large school district from two merged districts.
Franklin makes plain that one person, one vote is not offended by the creation of an at-large school district out of the merger of two former districts[5] and English stands for the proposition that apportionment statutes that do not violate *670 the doctrine are not subjected to strict scrutiny under a federal analysis. English, supra, 301 F.3d at 81 ("[W]e are satisfied that N.J.S.A. 18A:38-8.2 as applied to Lincoln Park does not violate the principle of `one person, one vote.' Consequently, we need not review the statute under strict scrutiny."). As strict scrutiny is not applicable, L. 2009, c. 78 must survive only the significantly more deferential standard of rational basis review, under which the law will be sustained so long as it bears some rational relationship to a legitimate state purpose. Greenberg, supra, 99 N.J. at 565-66, 494 A.2d 294.
Here, the State defendants contend that the State's purpose in enacting L. 2009, c. 78 is part of its larger effort to encourage financial accountability among local government units by reducing duplicative services and "clearing legal hurdles to shared services and consolidation." L. 2007, c. 43 (now codified at N.J.S.A. 40A:65-1 to 35). The Supreme Court has previously acknowledged the Department of Education's belief that larger districts generally are more efficient and its desire to provide incentive for the creation of larger, more efficient districts, "consistent with the Legislature's preference for such efficiencies." See Abbott v. Burke, 196 N.J. 544, 555, 960 A.2d 360 (2008) (Abbott XIX). The State defendants maintain that the Legislature's determination to eliminate non-operating districts by L. 2009, c. 78 and to redraw district boundaries to create at-large districts from the merger of former send/receive districts is well-within its authority to create a system of public schools in New Jersey and is entitled to deference by this court.
The United States Supreme Court has on several occasions noted the deference due state legislatures crafting educational policy:
The very complexity of the problems of financing and managing a statewide public school system suggests that "there will be more than one constitutionally permissible method of solving them," and that, within the limits of rationality, "the legislature's efforts to tackle the problem" should be entitled to respect. . . . In such circumstances, the judiciary is well advised to refrain from imposing on the States inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions.
[San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 42-43, 93 S.Ct. 1278, 1302, 36 L.Ed.2d 16, 39 (1973) (quoting Jefferson v. Hackney, 406 U.S. 535, 546-47, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285, 295-96 (1972)).]
Our own Supreme Court has echoed this view. Abbott v. Burke, 199 N.J. 140, 175, 971 A.2d 989 (2009) (Abbott XX) ("The political branches of government . . . are entitled to take reasoned steps, even if the outcome cannot be assured, to address the pressing, social, economic, and educational challenges confronting our state. They should not be locked in a constitutional straitjacket."). Whether analyzed under the federal rational basis test or New Jersey's balancing test, L. 2009, c. 78 easily survives attack. The Legislature is accorded wide latitude in discharging its constitutional obligation to create a system of public schools within the State. The State's interest in creating efficient and cost-effective school districts in carrying out that obligation is manifest. As the elimination of school districts that do not operate schools is rationally related to that interest and the redrawing of district boundaries to create at-large districts from the merger of these former districts *671 with their send/receive partners does not offend the principle of one person, one vote, plaintiffs' rights are not infringed and L. 2009, c. 78 passes muster under the Equal Protection Clause of the United States Constitution and article I, paragraph 1 of the New Jersey Constitution.

Taxation without Representation
Plaintiffs also argue that L. 2009, c. 78 violates the "Constitutional prohibition against `taxation without representation,'" relying on Township of Marlboro v. Bd. of Educ. of Freehold Reg'l High Sch., 992 F.Supp. 756 (D.N.J.1998). Assuming arguendo, that such a prohibition exists and that Township of Marlboro supports same, neither of which happens to be true, the argument is severely undercut by the statute itself.
Although the phrase, "taxation without representation" is certainly familiar, having been employed at various times by groups as disparate as twentieth century suffragists and past and present day residents of the District of Columbia, it is not one found in the Constitution. Heald v. District of Columbia, 259 U.S. 114, 124, 42 S.Ct. 434, 435, 66 L.Ed. 852, 855 (1922) ("There is no constitutional provision which so limits the power of Congress that taxes can be imposed only upon those who have political representation."). The District Court employed the phrase in Township of Marlboro, supra, 992 F.Supp. at 765 but did so to describe a situation it perceived as unfair, not unconstitutional. Township of Marlboro involved an "as-applied" challenge to the apportionment of seats on the nine member Freehold Regional High School District Board. Id. at 760. The District, established in 1954 by majority vote of the residents of each town, was made up of eight single district municipalities, each of which had one vote on the Board; with the largest of them, Howell, being allocated two votes. Id. at 758-59. The challenge was brought by two of the larger districts, Marlboro and Manalapan, which complained that the allocation of seats to the smaller districts afforded the votes of Marlboro's and Manalapan's representatives less weight than they would have through equal apportionment. Id. at 760. The District Court agreed and declared the statute unconstitutional as applied. Id. at 765.
The problem for the District Court concerned the remedy. Weighting the votes of the members in accordance with their relative populations, as the larger towns wished, although in accord with one person, one vote, would leave four of the nine members with less than one vote each. Further, the court found that the provisions permitting a district to withdraw from the regional district were so onerous as to make withdrawal a practical impossibility for these four small towns. It was this perceived unfairness to the smaller districts, which had entered into the regional arrangement assured that they would have a seat at the table and now were left with no voice and no escape, that prompted the remarks on which plaintiffs Rocky Hill and Millstone rely:
Thus, these constituent municipalities, which possessed one vote each prior to this application, are now reduced to a whisper in the wind, yet remain obligated to pay their apportioned share of the appropriations of the regional district. The stunning effect of taxation without representation contrary to the 1954 formation accords of one vote per constituent municipality is the type of distress that calls for a legislative solution. Although this Court writes on a clean slate, it is not the Court's prerogative to legislate through judicial fiat. This regional school district must provide a voice to all, not just some of its citizens. Accordingly, the New Jersey State Legislature *672 is the appropriate body to reconcile and remedy these disparate imperatives.
[Township of Marlboro, supra, 992 F.Supp. at 765 (emphasis supplied).]
Accordingly, the District Court declined to approve a specific apportionment scheme and instead referred the matter to the New Jersey Legislature. Ibid. Significant for our purposes, however, is the District Court's acknowledgement that it was doing so, not because the weighted voting proposed by the plaintiffs (resulting in "taxation without representation") was unconstitutional but because it was at odds with the understanding of the districts when they entered into the arrangement in 1954.[6]Ibid.
As this brief discussion demonstrates, there is no constitutional prohibition against taxation without representation and Township of Marlboro cannot fairly be read to suggest otherwise. Further, however, L. 2009, c. 78 does not appear to contain the flaw that plaintiffs fear. In accordance with the legislation, the Commissioner of Education has already adopted general fund tax levy apportionments for both merged districts. N.J.S.A. 18A:8-45. For Rocky Hill, the Commissioner adopted a general fund tax levy apportionment for the 2009-2010 year comprised of 38.5% equalized valuations and 61.5% enrollment in order to match the districts' 2009-10 actual general fund tax levies of $1,310,920 for Rocky Hill and $60,629,655 for Montgomery, meeting the statute's requirement that the first year's apportionment be accomplished in the least fiscally disruptive manner. N.J.S.A. 18A:8-45. This is in line with the sum that the districts had negotiated between themselves when they were in a send/receive relationship. The Commissioner has further determined that this formula will continue for the 2010-2011 school year and thereafter. Debt service on Montgomery's bonds will remain with Montgomery and all new debt approved by the merged district will be allocated in accordance with the general fund tax levy apportionment formula adopted by the Commissioner. Rocky Hill has no debt.
For Millstone, the Commissioner determined for 2009-2010, that Millstone raise $789,560 and Hillsborough raise $72,299,019, the same sums included in their 2009-2010 budgets certified for taxes. These sums are likewise in line with what the districts had agreed to between themselves when they were in a send/receive relationship. Going forward, the Commissioner has adopted a five-year phase-in to 50% equalized valuations and 50% enrollments. Using the 2009-2010 tax levies for illustration, this would appear to result in a projected $149,123 shift in the tax burden from Millstone to Hillsborough at the end of five years. See ECS's Report on Non-Operating School District Millstone 8-9 (June 30, 2009) http:/www.state. nj.us/education/counties/. Like Rocky Hill, Millstone has no debt. Debt service on Hillsborough's bonds will remain with Hillsborough and all new debt approved by the merged district will be allocated in accordance with the general fund tax levy apportionment formula adopted by the Commissioner.
*673 These apportionment formulas adopted by the Commissioner are not easily altered. See N.J.S.A. 18A:13-23.3 (specifying the five occurrences allowing for modification of an adopted apportionment formula). Most importantly for the concern expressed by plaintiffs that they will suffer taxation without representation, the formulas may not be modified by an at-large vote of the new merged districts. L. 2009, c. 78 provides that the apportionment methodology will be governed by chapter 13 of Title 18A of the New Jersey Statutes. N.J.S.A. 18A:8-45. Modification of an adopted apportionment formula is governed by N.J.S.A. 18A:13-23 and 13-23.3 N.J.S.A. 18A:13-23 requires any modification of the formula to be approved by the voters of each municipality. See In re Petition for Authorization to Conduct a Referendum on the Withdrawal of N. Haledon Sch. Dist. From the Passaic County Manchester Reg'l High Sch. Dist, 181 N.J. 161, 166, 854 A.2d 327 (2004). Accordingly, as any change in the adopted apportionment formulas, which were expressly premised on the sums Rocky Hill and Millstone were paying voluntarily to their send/receive partners, will require the approval of the voters of Rocky Hill and Millstone, plaintiffs' fear of taxation without representation would appear largely unfounded.[7]

Special Legislation
Plaintiffs' final contention is that L. 2009, c. 78 constitutes special legislation in violation of article IV, section 7, paragraph 19(7) of the New Jersey Constitution, by excluding particular municipalities from involvement and management of the public schools to which they send their children. A review of the law of prohibited special legislation, however, reveals the argument to be without merit.
Article IV, section 7, para. 9 of our State Constitution identifies certain subjects as eligible for treatment only by way of general legislation. The provision, which is not unique to New Jersey, became part of the Constitution of 1844 by amendment adopted in 1875 and was carried into the Constitution of 1947. N.J. Const. of 1844 art. IV, § 7, ¶ 7; N.J. Const. art. IV, § 7, ¶ 9. Such clauses were designed to limit the abuse of governmental power by curbing the propensities of legislatures to indulge in favoritism through the enactment of special laws. See Vreeland v. Byrne, 72 N.J. 292, 298, 370 A.2d 825 (1977), (citing 2 Sutherland, Statutory Construction § 40.01(4th ed. 1973)("As the bulk of special laws grew, demands for reform became insistent, and constitutional prohibitions were enacted to limit the practice of enacting special legislation and to achieve greater universality and uniformity in the operation of statute law in respect to all persons.")). Included among the subjects of New Jersey's constitutional prohibition is any private, special or local laws providing for the management and control of free public schools. N.J. Const. art. IV, § 7, ¶ 9(7). Plaintiffs contend that L. 2009, c. 78 violates this provision by excluding a class of citizens and municipalities, namely those citizens residing in towns having small populations, from representation on their local boards of education.
Our Supreme Court has adopted a three-part test to determine whether a statute passes as general legislation. The first step is to identify the purpose and object of the legislation; second, to apply the purpose to the facts to determine whether the act excludes something that should be included; and third, to determine whether, as applied, the classification *674 is reasonable in light of the identified purpose and object of the act. Newark Superior Officers Ass'n v. City of Newark, 98 N.J. 212, 223, 486 A.2d 305 (1985). The focus of any special legislation inquiry is always on what the Legislature has excluded from the ambit of the act. As explained in Budd v. Hancock over one hundred years ago:
A law is special in a constitutional sense when, by force of an inherent limitation, it arbitrarily separates some persons, places or things from others upon which, but for such limitation, it would operate. The test of a special law is the appropriateness of its provisions to the objects that it excludes. It is not, therefore, what a law includes that makes it special, but what it excludes. If nothing be excluded that should be contained the law is general. Within this distinction between a special and a general law the question in every case is whether any appropriate object is excluded to which the law, but for its limitations, would apply. If the only limitation contained in a law is a legitimate classification of its objects it is a general law. Hence, if the object of a law have characteristics so distinct as reasonably to form, for the purpose legislated upon, a class by itself, the law is general, notwithstanding it operates upon a single object only; for a law is not general because it operates upon every person in the state, but because every person that can be brought within its predicament becomes subject to its operation.
[Budd v. Hancock, 66 N.J.L. 133, 135-36, 48 A. 1023 (Sup.Ct.1901).]
The purpose of L. 2009, c. 78 is not difficult to discern; it is to eliminate the State's non-operating school districts and to merge them with the districts with which they were partnered in existing send/receive relationships. The difficulty in the analysis comes with the second part of the test. L. 2009, c. 78 applies to all of the state's non-operating school districts; none are excluded. Plaintiffs do not contend otherwise. Thus the inquiry ends. Because no district which could or should be included is excluded, there is no opportunity to determine whether, considering those excluded, the classification is reasonable in light of the identified purpose and object of the act. The object of this statute (the elimination of the non-operating districts) defines the class to which it applies (all districts not operating schools) and all possible class members have been included within its ambit. As the only limitation contained in L. 2009, c. 78 is a legitimate classification of its objects, it is, under the test of Budd v. Hancock, a general law.
Plaintiffs' special legislation argument is not so easily mapped. Plaintiffs skip over the crucial second part of the test requiring application of the law's purpose to the facts to determine whether the act excludes something that should be included. Instead, they jump from the purpose to the last step in the analysis to argue that as the likely effect of the legislation is unrelated to its purpose, and because it thus arbitrarily penalizes small municipalities such as Rocky Hill and Millstone, it should, for that reason, be declared unconstitutional. Plaintiffs acknowledge that the purpose of the act is to eliminate non-operating school districts. They argue, however, that the likely effect of the legislation will be to exclude residents of Rocky Hill and Millstone from serving on the new Boards of Education after the first election. Because they contend that the likely effect of excluding the residents of Rocky Hill and Millstone from serving on the new Boards of Education is not rationally related to the Legislature's purpose of eliminating the non-operating districts, the legislation is "unconstitutionally special." In *675 crafting this argument, plaintiffs have not engaged in any recognized special legislation analysis. They have simply made use of some of the language of special legislation to recast their argument that the Legislature need not have denied them designated board seats on the newly merged boards in the course of eliminating their non-operating districts. As noted previously, the Legislature is accorded wide latitude in discharging its constitutional obligation to create a system of public schools within the State. That it has determined to create new at-large districts from the merger of these former non-operating districts with their send/receive partners, with its attendant possibility of making it more difficult for residents of the smaller municipalities to be elected, does not make L. 2009, c. 78 impermissible special legislation under any recognized analysis. As the classification imposed by the statute is reasonable, embracing all non-operating school districts which should properly be included within its scope when viewed with respect to the legislative objective of eliminating such districts, the law is a general ore not violative of article IV, section 7, para. 9(7) of our Stale Constitution. See Alfred Vail Mutual Ass'n v. Shrewsbury, 58 N.J. 40, 49, 274 A.2d 801 (1971) ("[T]he issue is ultimately whether the classification imposed by the statute is reasonable, embracing all school districts which should properly be included within its scope when viewed with respect to the legislative objective.") (citations omitted).

Conclusion
For the reasons set out above, plaintiffs' motion for summary judgment declaring L. 2009, c. 78 unconstitutional is denied and the State defendants' cross-motion to sustain the validity of the statute is granted. An appropriate order accompanies this opinion.
NOTES
[1] The Department of Education refers to these districts as the "Phase I non-operational districts." The court has been advised by counsel for the parties that the Department of Education has suspended its plan to eliminate the Phase II non-operational districts as of July 1, 2010. The Department's decision to suspend elimination of the Phase II non-operational districts does not affect the analysis of the statute's constitutionality.
[2] Using the 2009-2010 tax levies for illustration, the ECS posits a $149,123 shift in the tax burden from Millstone to Hillsborough following a five-year phase-in as a result of the 50/50 formula. See ECS's Report on Non-Operating School District Millstone, 8-9 (June 30, 2009) available at http://www.state.nj.us/ education/counties/non-ops/millstone.pdf.
[3] Although these equal protection claims have been brought on behalf of all plaintiffs, plaintiffs concede that only Janine Lacava has standing to assert them. The remaining plaintiffs are not persons entitled to constitutional protections but entities created by the State, having only those rights accorded by statute. City of Newark v. New Jersey, 262 U.S. 192, 43 S.Ct. 539, 67 L.Ed. 943 (1923). Municipalities and local boards of education may not invoke the equal protection provisions of either the federal or state constitutions against their creator. Stubaus v. Whitman, 339 N.J.Super. 38, 770 A.2d 1222 (App. Div.2001), certif. denied, 171 N.J. 442, 794 A.2d 181 (2002), Any reference to "plaintiffs" in connection with the equal protection claims should be understood as limited to Lacava.
[4] The send-receive statute, N.J.S.A. 18A:38-8.2, provides that when the sending district's pupils comprise at least 10% of the total enrollment of the grades in which the sending district's students are enrolled in the receiving district, the sending district's Board of Education may appoint one member to serve on the receiving district's Board. Neither Rocky Hill nor Millstone ever met the 10% threshold and thus never had a voting representative on either receiving district's Board.
[5] At-large districts are problematic from a constitutional perspective only in the limited circumstance of claims of vote dilution not present here. See Thornburg v. Gingles, 478 U.S. 30, 47-48, 106 S.Ct. 2752, 2765, 92 L.Ed.2d 25, 45 (1986) (decided under the Voting Rights Act of 1965, 42 U.S.C.A. § 1973).
[6] This reading is confirmed by the District Court's supplemental opinion in which it noted that "application of a strict percentage of population formula, although constitutional, would be unjust." Township of Marlboro v. Bd. of Educ. of Freehold Reg'l High Sch., 9 F.Supp.2d 500, 501 (D.N.J.1998). The District Court also noted, contrary to the position of plaintiffs here, that "district-wide elections would meet appropriate constitutional standards" as well as the representative district scheme adopted by the Legislature. Id. at 502.
[7] It is significant in this regard that neither Rocky Hill nor Millstone had representation previously on its receiving district's board of education. See n. 4, infra.